CONNECTICUT COASTAL
FISHERMEN'S
ASSOCIATION

v.

REMINGTON ARMS COMPANY, INC.
and E.I. Dupont DeNemours and
Company.

Civ. No. B–87–250 (EBB).

United States District Court,
D. Connecticut.

Sept. 11, 1991.

David M. Lesser, Clendenen & Lesser, P.C., New Haven, Conn., Robert F. Kennedy, Jr., Conn. Coastal Fishermen's Ass'n, Garrison, N.Y., Jayne S.A. Pritchard, John Jay Legal Services, Inc., White Plains, N.Y., for plaintiff.

Francis J. Brady, Mark R. Sussman, R. Bradford Fawley, Murtha, Cullina, Richter & Pinney, Hartford, Conn., for defendants.

## RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

ELLEN B. BURNS, Chief Judge.

The parties have filed cross-motions for summary judgment on the amended complaint which alleges that the defendants violated the terms and provisions of the Clean Water Act ("CWA"), 33 U.S.C. § 1365, by their unpermitted and unlawful discharges of lead from point sources into the Long Island Sound, and that the defendants violated the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6972, 6945, and 6973, by their unpermitted storage and disposal of hazardous waste, illegal open dumping of solid hazardous waste, and creation of an imminent and substantial endangerment to the Long Island Sound and its biota. For the reasons set forth below, the court holds that it lacks jurisdiction over the alleged violations of the Clean Water Act and grants summary judgment for the defendants on those claims. The court holds that there are no genuine issues of material fact in dispute regarding whether the lead shot is solid hazardous waste and therefore grants plaintiff's motion for summary judgment on that claim arising under the Resource Conservation and Recovery Act. The court finds there are genuine factual issues as to the hazardous nature of the target debris and the cross motions for summary judgment as to that issue are accordingly denied.

## FACTS

From the late 1920's to at least December 31, 1986, Remington Arms Co., Inc. ("Remington") and its predecessors maintained a trap and skeet shooting club on Lordship Point in Stratford, Connecticut. Defendants' Statement of Undisputed Material Facts, filed Nov. 30, 1989, ¶ 1. Whether the defendants have maintained a trap and skeet shooting club at Lordship

Point at any time after December 31, 1986, is a genuine issue of fact. Defendants' Response dated July 14, 1989, ¶ 2. The defendants admit that no discharges of target or shot occurred after the time plaintiff filed its complaint in April of 1987. Defendants' Response dated July 14, 1989, ¶ 5.

As part of the sport of shooting, lead shot and clay targets fell onto land leased or owned by Remington and into the adjacent waters of Long Island Sound. Defendants' Statement dated Nov. 30, 1987, ¶ 2. Lead shot was fired at targets thrown from 12 concrete block trap and skeet ranges at the Remington Gun Club, and some lead shot and targets fell into the waters of Long Island Sound. Defendants' Responses dated July 14, 1989, ¶ 3. The shooting activities involved the use of thousands of tons of lead shot and artificial targets, producing spent lead shot, unbroken targets, and, for the more successful sportsmen, target fragments. Plaintiff's Annotated Statement dated July 15, 1988, ¶ 4; Defendants' Response dated July 14, 1989, ¶ 4. Approximately 4 million pounds of lead were deposited around Lordship Point as the result of trap and skeet shooting at the Remington Gun Club. Plaintiff's Annotated Statement, dated July 15, 1988, ¶ 7. Defendants apparently concede that approximately 11 million pounds of target have been deposited around Lordship Point, but they dispute whether that 11 million pounds presently remain distributed in the waters around Lordship Point. Defendants' Response dated July 14, 1989, ¶ 12.

Remington has never had a CWA permit to discharge pollutants at the Gun Club, nor an RCRA permit to dispose of hazardous wastes at the Gun Club. Plaintiff's Annotated Statement, dated July 15, 1988, ¶¶ 14–15.

On August 19, 1985, the Connecticut Department of Environmental Protection ("DEP"), pursuant to its water pollution abatement authority, issued Order No. WC4122 to Remington requiring it to study the effects of lead shot fired from the Gun Club on the sediments, aquatic life and water fowl of Long Island Sound and to take remedial measures. Defendants'

Statement dated Nov. 30, 1987, ¶¶ 3, 4. Under § 402(a) and (b) of the Clean Water Act, 33 U.S.C. § 1342(a) and (b), the Administrator of the EPA has authorized the DEP to issue National Pollutant Discharge Elimination System (NPDES) permits. The DEP Order was modified on October 24, 1986 to require that Remington cease the discharge of lead shot to the waters of the State of Connecticut on or before December 31, 1986. Defendants' Statement dated Nov. 30, 1987, ¶ 6. The parties dispute whether the DEP Order was issued under the DEP's delegated authority to issue NPDES permits under the CWA. Plaintiff's Annotated Statement, dated July 15, 1988, ¶ 16; Defendants' Response, dated July 14, 1989, ¶ 16. The DEP does not have authority to issue hazardous waste permits under RCRA. *Id.*

On or about April 18, 1988, the DEP provided the plaintiff ("CCFA") with an opportunity to comment on the Remediation Study of the Gun Club site prepared by Battelle Ocean Sciences. The material provided to CCFA included specific remediation proposed by Remington to comply with DEP Order No. WC4122. Defendants' Supplemental Statement, dated July 14, 1989, ¶ 3. CCFA responded to DEP regarding the remediation proposal on or about May 13, 1988, expressing concern that target debris, and especially polycyclic aromatic hydrocarbons ("PAH") associated with such targets, be considered before the DEP approved the remediation proposal. Defendants' Supplemental Statement, dated July 14, 1989, ¶ 4. The DEP pursued CCFA's concerns about the clay targets with Remington. Defendants' Supplemental Statement, dated July 14, 1989, ¶¶ 5–7. The parties dispute whether the Remington Gun Club is permanently closed. John Preisser, Remington's vice-president, has stated that Remington has made a final, irrevocable decision not to reopen the Gun Club. But plaintiff fears that Remington may change its mind. Plaintiff's Response, dated September 15, 1989, ¶ 2. Although Remington is a wholly-owned subsidiary of DuPont, the defendants contend that DuPont has never owned or operated the Gun

Club. Defendants' Statement dated Nov. 30, 1987, ¶ 17.

DISCUSSION

Part One: CLEAN WATER ACT

Since amendment in 1987, the Clean Water Act precludes citizen suits where "a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection." 33 U.S.C. § 1319(g)(6)(A)(ii). Thus, in order to determine whether the court may exercise jurisdiction over this case under the Clean Water Act, the court must determine whether (1) the State law under which the Connecticut Department of Environmental Protection (DEP) is proceeding is "comparable to" 33 U.S.C. § 1319(g) and (2) the DEP is "diligently prosecuting" its action. For reasons discussed below, this court concludes that Connecticut environmental laws, which grant enforcement powers to the DEP and contain procedural safeguards, are comparable to the federal statute, and that the DEP's ongoing enforcement efforts constitute diligent prosecution according to the meaning of the Act. Therefore, this court does not have jurisdiction to hear the plaintiff's Clean Water Act claims.

I. THE STATE LAW UNDER WHICH THE CONNECTICUT DEPARTMENT OF ENVIRONMENTAL PROTECTION IS PROCEEDING IS "COMPARABLE TO" THE RELEVANT PROVISIONS OF THE CLEAN WATER ACT.

█ Plaintiff filed this suit on April 24, 1987, shortly after amendments to the Clean Water Act were passed by Congress in February, 1987. The amendments became effective immediately upon passage. For the most part, plaintiff relies upon the language and construction of the pre-amendment Act. Therefore, it is useful to review briefly the history and philosophy of the Clean Water Act's enforcement provi-

sions before addressing the plaintiff's claims.

A. *Enforcement of the Clean Water Act Prior to 1987*

1. Governmental Enforcement Provisions

Section 301(a) of the Federal Water Pollution Control Act Amendments of 1972 (Clean Water Act), 33 U.S.C. § 1311(a), prohibits the discharge of pollutants except in compliance with other sections of the Act. Section 402, 33 U.S.C. § 1342, established the National Pollutant Discharge Elimination System (NPDES), which allows the Environmental Protection Agency to issue permits authorizing effluent discharges. Among other provisions, this section authorizes states to establish and administer their own permit programs and allows for the imposition of civil and criminal penalties to abate violations of the permit or permit program.[1] Connecticut's NPDES program was established in 1973.

Frank P. Grad's *Treatise on Environmental Law* discusses changes in environmental regulatory philosophy as evidenced by passage of the Clean Water Act and subsequent amendments. The object of the 1972 Act, as expressed in the legislation's declaration of goals and policies, was "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," ultimately eliminating all water pollution. 33 U.S.C. § 1251(a). The statute replaced a more decentralized regulatory scheme which did not call for rigorous remediation measures.[2] The 1977 amendments showed both a relinquishment of the zero pollution goal and a shift of enforcement emphasis away from the federal government to state agencies. The Act contains "repeated expressions of the intent of Congress that the states bear responsibility for management and enforcement in the first instance, though leaving ultimate authority to the Administrator of the EPA." Grad, *Treatise on Environ-*

---

1. State program requirements are described in 40 C.F.R. § 123.1 *et seq.*

2. *See National Wildlife Federation v. Gorsuch,* 693 F.2d 156, 176 (D.C.Cir.1982) and *Student*

*Public Interest Research Group, Inc. v. P.D. Oil & Chemical Storage, Inc.,* 627 F.Supp. 1074, 1078–79 (D.N.J.1986) for a discussion on the problems of federal water pollution law prior to 1972.

*mental Law,* 3–103. For example, 33 U.S.C. § 1251(b) states: "It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter." Furthermore, "[i]t is the policy of Congress that the authority of each State to allocate quantities of water within its jurisdiction shall not be superseded, abrogated or otherwise impaired by this chapter." 33 U.S.C. § 1251(g). Grad reads the history of the Clean Water Act as a progression away from centralized management and enforcement to a state-controlled locus consistent with federalist principles.[3]

### 2. Private Enforcement Provisions

In addition to Federal and State enforcement actions, the Clean Water Act includes provisions for citizen suits.[4] The Act attempts to draw a balance between vigorous enforcement and noninterference with existing governmental efforts by imposing certain restrictions on citizens wishing to file suit. Prior to 1987, the Clean Water Act precluded citizen suits where the EPA

or a "State has commenced and is diligently prosecuting *a civil or criminal action in a court* of the United States, or a State to require compliance with the standard, limitation, or order...." 33 U.S.C. § 1365(b)(1)(B) (emphasis supplied).[5]

Several public policy rationales explain the restrictions on citizen enforcement. First, Congress sought to protect alleged polluters from duplicative prosecution for the same violations.

> The private enforcement provision of [the Clean Water Act] was designed to serve a twofold purpose—first to act as a spark to ignite agency enforcement and second to act as an alternative enforcement mechanism absent agency enforcement. Congress provided, however, that citizen suits should be subordinate to agency enforcement and devised restrictions to ensure that result. [U]nder [these restrictions], a defendant would "not be subjected simultaneously to multiple suits, and potentially to conflicting court orders, to enforce the same statutory standards." *Connecticut Fund for Environment, Inc. v. Upjohn Co.,* 660 F.Supp. 1397, 1403 (D.Conn.1987), quoting *Connecticut Fund for Environ-*

---

**3.** The Second Circuit had explicitly acknowledged the primacy of state authority even before the passage of the 1977 amendments; *see e.g., Mianus River Preservation Committee v. Administrator, EPA,* 541 F.2d 899, 902 (2d Cir.1976) ("[T]he legislative history of Section 402 clearly shows that Congress intended that the States have a great deal of autonomy in administering their own permit programs....").

**4.** 33 U.S.C. Section 1365(a) states:
"Except as provided in subsection (b) of this section, any citizen may commence a civil action on his own behalf—
(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation, or
(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.

The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an effluent standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties under section 1319(d) of this title."

**5.** The full text of 33 U.S.C. Section 1365(b) reads:
"No action may be commenced—
(1) under subsection (a)(1) of this section—
(A) prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order, or
(B) if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order, but in any such action in a court of the United States any citizen may intervene as a matter of right."

*ment, Inc. v. Contract Plating Co.,* 631 F.Supp. 1291, 1293 (D.Conn.1986).[6]

In addition to protecting defendants from multiple suits, the limitations on citizen enforcement allow for smoother operation of the ordinary enforcement mechanisms. "[R]ecognizing the 'obvious danger that unlimited public actions might disrupt the implementation of the Act and overburden the courts,' Congress incorporated explicit restrictions on citizen suits" into the Clean Water Act. *Friends of Earth v. Consolidated Rail Corp.,* 768 F.2d 57, 63, (2d Cir.1985), quoting *Natural Resources Defense Council, Inc. v. Train,* 510 F.2d 692, 700 (D.C.Cir.1974). Were it not for these restrictions, citizens dissatisfied with court-ordered relief might choose to file suit, even if the governmental action had been adequate to abate and remediate the pollution. This would impinge on the authority and autonomy of federal and state agencies to regulate water pollution pursuant to the Clean Water Act. Thus, to protect defendants from multiple lawsuits and to preserve agency authority, Congress chose not to allow citizen actions to compete with suits filed by state or federal environmental agencies.

The language of § 1365(b)(1)(B) has been construed differently in different circuits.

**6.** *But see Brewer v. Bristol,* 577 F.Supp. 519, 526 (E.D.Tenn.1983) ("While it is possible that the federal court might impose greater sanctions on the defendants than those imposed by the state court or impose a heavier penalty, in all probability those sanctions would be cumulative rather than conflicting.... More importantly, with regard to the FWPCA, Congress has demonstrated a policy of approving piecemeal litigation under the proper circumstances. For example, under the FWPCA concurrent actions may be brought by the EPA and a state agency or a private citizen and a state agency where the state fails to 'diligently prosecute a civil or criminal action for enforcement.'") (citation omitted)

**7.** The Ninth Circuit followed the *Consolidated Rail* holding in *Sierra Club v. Chevron U.S.A., Inc.,* 834 F.2d 1517 (9th Cir.1987). The *Sierra Club* court noted that similar citizen suit provisions are contained in the Toxic Substances Control Act, 15 U.S.C. Section 2619(b)(1)(B); the Endangered Species Act, 16 U.S.C. Section 1540(g)(2); the Marine Protection, Research, and Sanctuaries Act, 33 U.S.C. Section 1415(g)(2); the Resource Conservation and Recovery Act, 42 U.S.C. Section 6972(b); and the

The Second Circuit has construed the statutory language narrowly to require an actual suit filed in a court to preclude a citizen enforcement action. *See Friends of Earth v. Consolidated Rail Corp.,* 768 F.2d 57 (2d Cir.1985).[7] Mere state agency enforcement actions, including consent orders, were held to be insufficient because

> [the state agency]'s enforcement powers are significantly weaker than those available to the EPA in the federal courts. [The state] cannot enjoin polluters without the assistance of the New York Attorney General and a court order. Further, it is unclear whether, without judicial imprimatur, [the state] can assess penalties in excess of $1,000 per violation.... Citizens are not permitted to intervene as of right and the [state agency] enforcement procedure "does not otherwise resemble a suit in federal court in that it embraces none of the procedural safeguards found in federal court proceedings." *Friends of the Earth v. Consolidated Rail,* 768 F.2d at 62 (citations omitted).

This case has been cited for the principle that administrative action in lieu of judicial proceedings does not bar citizen suits under § 1365(b).[8]

Hazardous Pipeline Safety Act, 49 U.S.C.App. Section 2014(b). The court did not elaborate on whether these statutes contained limitations on citizen enforcement similar to those found in the Clean Water Act, nor did it discuss the construction of these provisions by courts.

**8.** *See e.g., Connecticut Fund for Environment v. L & W Industries, Inc.,* 631 F.Supp. 1289, 1291 (D.Conn.1986); *Mumford Cove Ass'n v. Town of Groton,* 640 F.Supp. 392, 396 (D.Conn.1986). But in the Third Circuit, *Baughman v. Bradford Coal Co.* 592 F.2d 215, (3rd Cir.1979), *cert den. Bradford Coal Co. v. Baughman,* 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979), and *Student Public Interest Research Group, Inc. v. Fritzsche, Dodge, and Olcott,* 759 F.2d 1131 (3rd Cir.1985) held that under certain circumstances an agency enforcement action can be considered the functional equivalent of an "action in a court." The criteria to which the court looks in making this determination are 1) whether the coercive powers of the administrative agency are equivalent to the powers of the EPA in a federal court (including the power to enforce compliance and the power to impose civil penalties) and 2) whether the agency pro-

The legislative history of § 1365(b) supports this reading of the language at issue. The 1972 Senate Report indicated that courts should evaluate the adequacy of the agency's enforcement actions and permit citizen suits where the state enforcement is deemed inadequate.

It should be emphasized that if the agency had not initiated abatement proceedings following notice or if the citizen believed efforts initiated by the agency to be inadequate, the citizen might choose to file the action. In such a case, the courts would be expected to consider the petition against the background of the agency action and could determine that such action would be adequate to justify suspension, dismissal, or consolidation of the citizen petition. On the other hand, *if the court viewed the agency action as inadequate, it would have jurisdiction to consider the citizen action notwithstanding any pending agency action.* Senate Report No. 92–414, 92d Congress, 2d Session, 1972 U.S.Cong. and Ad.News, 3668, 3746 (emphasis supplied).

The Senate Report seems to authorize close judicial scrutiny of state administrative action and would not bar citizen suits where agency enforcement proceedings were deficient.

### 3. Plaintiff's Claims

■ This court is bound by the construction of the Second Circuit in *Friends of the Earth v. Consolidated Rail,* which allows citizens in this jurisdiction to commence enforcement suits pursuant to 33 U.S.C. § 1365 notwithstanding prior state agency enforcement actions. Plaintiff relies on *Consolidated Rail* to argue that this court has jurisdiction over Clean Water Act claims despite the Connecticut Department of Environmental Protection's administrative proceedings against defendant Remington. Were § 1365 still controlling in this case, this court would agree. However, as we will discuss below, Clean Water Act amendments in 1987 expanded the limi-

tation on citizen suits. Under 33 U.S.C. § 1319(g), citizen suits are precluded when a state is diligently conducting agency enforcement proceedings against a defendant.

Plaintiff also claims support from a 1987 Supreme Court decision, *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.,* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306, (1987), which held that good faith allegations of ongoing violations state a valid Clean Water Act claim. Yet in the *Gwaltney* opinion, the Court repeatedly stressed Section 1365(b)'s restrictions on citizen suits. *"In the absence of federal or state enforcement,* private citizens may commence civil actions against any person 'alleged to be in violation of' the conditions of either a federal or state NPDES permit." *Id.* at 53, 108 S.Ct. at 379 (emphasis supplied) (citation omitted). The Court noted that the Act requires potential plaintiffs to provide 60 days' notice to the defendant, the federal EPA Administrator, and the State before commencing their suit. This notice period, the Court reasoned, is intended to enable governmental agencies to respond by initiating actions against the alleged polluter. "[I]f the Administrator or the State commences enforcement action within that 60 day period, the citizen suit is barred, presumably because governmental action has rendered it unnecessary." *Id.* at 59, 108 S.Ct. at 382. Thus, the citizen suit provision is intended merely to allow private attorneys general to fill in gaps in public enforcement.

The bar on citizen suits when governmental enforcement action is underway suggests that the citizen suit is meant to supplement rather than to supplant governmental action. The legislative history of the Act reinforces this view of the role of the citizen suit. The Senate Report noted that "[t]he Committee intends the great volume of enforcement actions [to] be brought by the State," and that citizen suits are proper only "if the Federal, State, and local agencies fail to exercise

ceedings contain procedural safeguards comparable to those available in a court action (including citizen intervention). Thus, a citizen

suit brought in the Third Circuit could be barred under § 1365(b) by certain agency enforcement actions.

their enforcement responsibility." *Id.* at 60 [108 S.Ct. at 383] (citation omitted). Finally, the *Gwaltney* Court summarized that "[r]espondents' interpretation of the scope of the citizen suit would change the nature of the citizens' role from interstitial to potentially intrusive. We cannot agree that Congress intended such a result." *Id.* at 61, 108 S.Ct. at 383. Clearly *Gwaltney* cannot be read to provide unqualified support for plaintiffs wishing to bring Clean Water Act suits where a state agency has commenced enforcement proceedings against an alleged violator.

## B. *Effect of 1987 Amendment on Citizen Suit Provision*

In February of 1987, Congress passed an amendment to the Clean Water Act which barred citizen suits where "a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection." Section 309(g)(6), 33 U.S.C. § 1319(g)(6)(A)(ii).[9] The subsection authorizes the EPA to assess administrative penalties for Clean Water Act violations. Plaintiff contends that this amendment creates a narrow exception to *Consolidated Rail* for cases in which the state agency is seeking civil penalties or has issued a final order not subject to judicial review.[10] Plaintiff argues that since DEP has not assessed civil penalties against defendant, § 1319(g) does not apply and its suit is not barred.

Since plaintiff's suit was brought less than three months after the 1987 amendment was passed, plaintiff could cite no authority for its narrow reading of the statute. To date, no court in the Second

Circuit appears to have construed the language at issue. However, after examining the logic of recent cases in other circuits addressing this question, this court holds that plaintiff's reading is faulty and that 33 U.S.C. § 1319(g)(6) bars citizen suits where a state agency conducting enforcement proceedings against the defendant has authority to assess civil penalties, regardless of whether the agency has actually assessed such penalties.

In *Atlantic States Legal Foundation, Inc. v. Tyson Foods, Inc.*, 682 F.Supp. 1186 (N.D.Ala.1988), *reversed on other grounds*, 897 F.2d 1128 (11th Cir.1990), the court held that an Alabama law which provides for the imposition of civil penalties by the Alabama Department of Environmental Management (DEM) is a law comparable to § 1319(g). The court reasoned that Congress had amended the Clean Water Act in part to eliminate federal jurisdiction in cases where state agencies had initiated enforcement proceedings:

> The pertinent provision of section 1319(g)(6) speaks only of prosecution of 'an action under a State law comparable to this subsection.' The crucial phrase 'in a court' is not found in section 1319(g)(6). Presumably this evinces an intention on the part of Congress to avoid the result in *Consolidated Rail.* *Atlantic States Legal Foundation,* 682 F.Supp. 1186, 1188.

Thus, the court ruled that it had no jurisdiction despite the fact that the Alabama DEM, like the Connecticut DEP in the case at bar, had chosen not to impose civil penalties on the defendant.

---

**9.** 33 U.S.C. Section 1319(g)(6)(A) reads in full: "Action taken by the Administrator or the Secretary, as the case may be, under this subsection shall not affect or limit the Administrator's or Secretary's authority to enforce any provision of this chapter; except that any violation—

(i) with respect to which the Administrator or the Secretary has commenced and is diligently prosecuting an action under this subsection,

(ii) with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection, or

(iii) for which the Administrator, the Secretary, or the State has issued a final order not subject to further judicial review and the viola-

tor has paid a penalty assessed under this subsection, or such comparable State law, as the case may be,

shall not be the subject of a civil penalty action under subsection (d) of this section or section 1321(b) of this title or section 1365 of this title."

**10.** "An administrative enforcement action is comparable only when the state has commenced and is diligently prosecuting an administrative action *for civil penalties* or when the State has issued a final order not subject to review, for which the violator has paid the penalty." Plaintiff's Memorandum in Support for Motion for Summary Judgment, p. 45.

Most recently, a First Circuit district court construed § 1319(g) earlier this year. In *North and South Rivers Watershed Ass'n, Inc. v. Town of Scituate*, 755 F.Supp. 484 (D.Mass.1991), defendant argued that an Administrative Order issued by the Massachusetts Department of Environmental Protection (DEP) barred a subsequent citizen suit. Plaintiff contended that the DEP issued its order pursuant to a section of state law that does not authorize the imposition of civil penalties, rather than to a related section that does, and thus that the law under which the DEP proceeded was not comparable to § 1319(g). The court held that the relevant comparison under the Clean Water Act was to the overall state regulatory scheme rather than to individual sections of state law.

> The proper method for determining whether the DEP issued the Order under a comparable state law is not to parse the statute to identify which of its many powers the DEP invoked at a particular time. Rather, it is enough that the Massachusetts statutory scheme contains penalty assessment provisions equivalent to those in the Federal Act. Although the DEP has not yet chosen to employ these penalty assessment provisions in the instant Order, that election does not change the fact that the statutory scheme under which the DEP acts is comparable. *Id.* at 486.

The court also examined the substantive meaning of "comparable." "A state law that is 'comparable' within the meaning of the Federal Act 'must include provisions as to public notice and participation, penalty assessment, judicial review, and other matters comparable to those in § 1319(g).'" *Id.* at 485–86, quoting *Atlantic States Legal Foundation v. Universal Tool & Stamping*, 735 F.Supp. 1404, 1415 (N.D.Ind.1990). The court decided that although the Massachusetts statute does not provide for prior public notice of a penalty order, the overall regulatory scheme is comparable to § 1319(g) because it affords significant citizen participation. The court noted that an individual may intervene in subsequent proceedings to assess the civil penalty. Also, under Massachusetts law, ten or more individuals may intervene in any adjudicatory proceeding alleging damage to the environment. Thus, because the state law under which the agency was exercising its enforcement powers is comparable to § 1319(g) of the Clean Water Act, plaintiff's claim was barred.

*Atlantic States Legal Foundation v. Universal Tool & Stamping*, supra, describes other factors to be included in the comparability analysis. The court determined that in order to be "comparable" to the administrative penalty section of the Clean Water Act, state statutes must include the right to a public hearing on the proposed penalties, a list of penalty assessment factors analogous to the ones found in the federal statute, and standards for obtaining judicial review of administrative decisions. Although the *Universal Tool* court held that the Indiana statutes did not meet this comparability standard, Connecticut's laws include these factors and are thus comparable to § 1319(g).

Although none of these cases are binding upon this court, the logic of their arguments is persuasive. As defendant correctly notes, § 1319(g) grants a broad array of enforcement powers to the Administrator. He may issue administrative orders to require compliance or to assess penalties for current or past transgressions. He may also commence criminal prosecution or civil actions for injunctive relief or penalties. The defendant must be notified and allowed to request a public hearing before the assessment of penalties through administrative order. Any such order is subject to judicial review, and the agency must consider the specific circumstances of the case in making its penalty determination. These enforcement powers and procedural safeguards are similar to those provided by Connecticut law.

Connecticut authorizes the DEP to assess civil penalties [11] and issue injunctions [12] through administrative orders.

---

**11.** Conn.Gen.Stat. § 22a–6b(a).

**12.** Conn.Gen.Stat. § 22a–432.

Like the Administrator proceeding under the Clean Water Act, the DEP must consider the specific circumstances before assessing penalties,[13] provide a public hearing on request,[14] and submit to judicial review.[15] These elements make the Connecticut law under which the DEP is proceeding comparable to § 1319(g). Finally, although Connecticut law liberally allows intervenors in DEP enforcement actions,[16] and although plaintiff was notified of the DEP's proposed orders against defendant, plaintiff chose not to intervene.

## II. THE DEP'S ENFORCEMENT ACTION CONSTITUTES "DILIGENT PROSECUTION" UNDER THE TERMS OF § 1319(g).

█ Plaintiff contends that the DEP did not diligently prosecute defendant because its order did not assess monetary penalties, did not compel defendant to obtain an NPDES permit, and did not require the termination of discharges other than lead (namely steel shot or target materials). The DEP's enforcement was limited to an order terminating lead discharges and mandating remediation of lead contamination.

Before the 1987 amendment, few courts had examined the meaning of "diligent prosecution," and several of those that did merely looked at the time sequence of the actions filed to hold that prior state agency suits preclude citizen actions.[17] In one case that did examine the "diligent prosecution" language, *Connecticut Fund for the Environment v. Contract Plating Co.*, 631 F.Supp. 1291, 1293 (D.Conn.1986), the court imposed a heavy burden on plaintiffs who assert that the state's prosecution is not diligent. "The court must presume the diligence of the state's prosecution of a defendant absent persuasive evidence that the state has engaged in a pattern of conduct in its prosecution of the defendant that could be considered dilatory, collusive or otherwise in bad faith." In *Contract Plating*, neither the fact that the state alleged fewer separate violations nor that it sought a less substantial civil penalty was held to constitute nondiligent prosecution.[18] Furthermore, the court noted that the plaintiffs could have moved to intervene in the

13. Conn.Gen.Stat. § 22a–6b(c).

14. Conn.Gen.Stat. § 22a–6b(e).

15. Conn.Gen.Stat. § 22a–6b(f).

16. Conn.Gen.Stat. § 22a–19.

17. *See Friends of the Earth v. Consolidated Rail Corp.*, 768 F.2d 57, 63 (2d Cir.1985) ("Our holding obviates the need to determine, in this case, the meaning of diligent prosecution."); *Connecticut Fund for the Environment v. Job Plating Co.*, 623 F.Supp. 207, 215 (D.Conn.1985) ("Only where there has been [a state enforcement action prior to the filing of a citizen suit] is it possible to consider whether that action is 'diligent prosecution' that would preclude the filing of the citizen suit.... Apart from *Sierra Club v. Simkins Industries, Inc., supra* [617 F.Supp. 1120 (D.Md.1985)] in which the state agency acted after the citizen suit had been filed in federal court, all the cases that have considered Section 1365(b)(1)(B)'s diligent prosecution provision ... deal with enforcement actions that commenced (and usually culminated) *prior* to the institution of the citizen suit.") (citations omitted); *see e.g., Connecticut Fund for the Environment v. Upjohn*, 660 F.Supp. 1397 (D.Conn. 1987), *Brewer v. City of Bristol*, 577 F.Supp. 519, 528 (E.D.Tenn.1983); *but see Connecticut Fund for the Environment v. L & W Industries, Inc.,*

631 F.Supp. 1289 (D.Conn.1986) (Stipulated judgment in a suit brought by the State of Connecticut in May, 1982 did not preclude a citizen suit filed in December of 1983); *United States EPA v. City of Green Forest, Arkansas,* 921 F.2d 1394, 1403 (8th Cir.1990) ("In this case, we are faced squarely with the question whether citizens' claims brought prior to a government action are properly dismissed when a consent decree is entered in a later-filed EPA action. Recognizing the preeminent role that government actions must play in the Clean Water Act enforcement scheme, we hold that they are.").

18. *But see United States v. Cargill, Inc.,* 508 F.Supp. 734 (D.Del.1981) (EPA allowed to sue under the Clean Water Act in federal court despite the existence of a pending suit filed by state department of natural resources seeking identical relief in state court. The EPA Administrator found the state action unsatisfactory in two respects: 1) compliance with a proposed construction schedule was not mandatory, and 2) the proposed settlement penalty was deemed grossly inadequate.); *see also Merry v. Westinghouse Electric Corp.,* 697 F.Supp. 180 (M.D.Pa. 1988) (Where defendant had not complied with agency's consent order within established time limits, and where agency had not responded to this tardiness, citizen suit not barred by "diligent prosecution.").

state action. Thus, the court concluded that the plaintiff's suit was barred.[19]

This court also addressed diligent prosecution tangentially in the course of performing abstention analysis in *Connecticut Fund for the Environment v. Upjohn*, 660 F.Supp. 1397, 1406 (D.Conn.1987).

> The interests being pursued by plaintiffs in both suits are identical in the sense they are seeking the same equitable relief and similar legal remedies. However, the suits are dissimilar in the number of violations alleged; the number of effluents involved in each complaint …; the dates of the violations; and the identity of the plaintiffs. While the differences between the two suits might not be critical in assessing the adequacy of the state court action, for purposes of determining the diligence of the state prosecution, such differences are sufficient to dictate against abstention [on] the basis of similarity of issues.

The court implies that more substantial differences between suits would be necessary in order to find the state's prosecution nondiligent.

The court notes that a recent District Court case within the Second Circuit ultimately provides no support for granting jurisdiction in this suit. In *Hudson River Fishermen's Association v. County of Westchester*, 686 F.Supp. 1044 (S.D.N.Y.1988), the court held that plaintiffs' Clean Water Act suit was not barred by prior governmental action to close a landfill because the leachate from the landfill into nearby waters was not directly addressed in the settlement. "[I]t is conceivable that the source of that pollution is technically beyond the scope of the original consent judgment and subsequent contempt settlement in [the government litigation]." *Id.* at 1052. Plaintiff could extend this logic to argue that its suit addresses

the eleven million pounds of target discharges not addressed by the DEP's orders, and therefore should not be barred. However, the facts in *Hudson River* are readily distinguishable from the case at bar. The *Hudson River* court noted that the government was acting under the Rivers and Harbors Act, not a state statute comparable to the Clean Water Act; that the remedies sought in the two suits were different; that the plaintiff was not allowed to intervene in the government's action, thereby leaving it without a remedy; and that the state agency had refused to act on a permit application pending reclassification of the defendant's landfill. These distinctions are significant enough to ensure that the *Hudson River* holding is not binding in this case.

Additionally, dicta in *Hudson River* make clear that plaintiff's remedies are intended only as substitutes for governmental enforcement. "The thrust of the CWA is to provide *society* with a remedy against polluters in the interest of protecting the environment. If the Government's action achieves that end, the fact that [plaintiffs] or any other private attorney general is barred from duplicating that effort should hardly seem surprising or harsh." *Id.* at 1052 (citation omitted). "We emphasize that when the Government is actively litigating a corollary enforcement effort, plaintiffs bringing citizen suits under the CWA are not entitled to maintain their actions simply to secure 'personalized' relief. Such actions are not barred, however, when it appears that the Government's effort does not address the factual grievances asserted by private attorneys general." *Id.* at 1052–53. *Hudson River* recognizes the hazards of citizen interference in governmental enforcement.

---

**19.** That holding does not contradict the prior ruling in *Connecticut Fund for the Environment v. Job Plating Co.*, 623 F.Supp. 207 (D.Conn. 1985). In that case, the court noted that the citizen suit sought penalties for NPDES permit violations and an injunction against future violations, while the state suit merely required the submission of an engineering report and subsequent placement of an approved waste water treatment facility. No civil penalties were assessed against the defendant. The court concluded that plaintiffs were entitled to bring suit. The controlling factor in the case, however, was the fact that plaintiffs had filed their suit prior to the initiation of court proceedings by the state. The court was not required to reach the issue of diligence on the part of the state.

Courts in other jurisdictions have read "diligent prosecution" to grant state agencies considerable latitude. In *Atlantic States Legal Foundation v. Tyson Foods*, 682 F.Supp. 1186 (N.D.Ala.1988), *reversed on other grounds*, 897 F.2d 1128 (11th Cir.1990), the court held that the Alabama Department of Environmental Management (DEM) was "diligently prosecuting" its action because defendant's plant was the subject of an administrative order which required the defendant to construct a treatment facility to bring the plant into compliance. "[The State], in exercising its discretion, required Tyson to make costly changes to its Heflin wastewater facility in lieu of the immediate imposition of fines. This discretion should not be threatened by the risk of citizen suits when [the State] is diligently pursuing an administrative solution to the pollution problem at the Heflin plant." *Id.* 682 F.Supp. at 1189. The court also cited *Gwaltney* for the proposition that policy considerations require keeping citizen suits in an interstitial, rather than intrusive, role. The court concluded that plaintiff's suit was barred by DEM's diligent prosecution under a comparable state law.

A court in the First Circuit took a hands-off approach to evaluating state agency action. The court held that diligent prosecution is not limited to "order[ing] compliance with the Federal Act by a date certain, in accordance with a timetable against which compliance may be measured, and provid[ing] civil penalties for violations.... [Rather,] the statute calls for a more deferential approach that does not circumscribe the administrator's discretion to implement a plan that, in his expert judgment, adequately addresses a violation." *North and South Rivers Watershed Ass'n, Inc. v. Town of Scituate*, 755 F.Supp. 484, 486–7 (D.Mass.1991). This reasoning is consistent with the historical trend toward state autonomy in enforcing Clean Water Act violations described *supra*. Ultimately, the court barred the citizen suit.

Although the court in *Atlantic States Legal Foundation v. Universal Tool & Stamping, supra*, held that the state's prosecution was not diligent, the facts in that case reveal an extreme example of agency laxity. Defendant Universal admitted that plaintiff's lawsuit, and not the state administrative enforcement proceedings, had spurred it to action. In addition, the consent decree, which ordinarily required four to six weeks for approval by the state environmental protection agency, was approved in one day. Finally, the court judged the penalty too lenient to constitute diligent prosecution. Thus plaintiff's suit was allowed to proceed. *Universal Tool* ultimately supports the notion that state agencies should be given considerable latitude in their enforcement actions; however, the degree of slack demonstrated by the state of Indiana was beyond the bounds of appropriate discretion.

It is undeniable that the Connecticut DEP's action is more limited in scope than the relief plaintiff is requesting. Yet by law the state has considerable discretion over its enforcement actions. Prior to the filing of plaintiff's suit, the DEP had been monitoring the situation at Lordship Point for almost two years. The DEP became involved in May, 1985 when it took samples at the site which revealed elevated levels of lead in sediments and shellfish. On August 19, 1985, the DEP issued a water pollution abatement order which demanded remediation of the site by August 31, 1986. The DEP approved the scope of defendant's remediation study on February 3, 1986. On October 10, 1986, the DEP modified the 1985 order and required defendant to include a plan to remediate sediments and cease shooting by December 31, 1986. Pursuant to these orders, defendant closed the Gun Club to the public and has kept it closed since that time. While plaintiff may prefer more vigorous enforcement, the DEP's actions are not so remiss as to be rejected under the diligent prosecution standard.

Furthermore, a ruling in plaintiff's favor could have longterm negative consequences. The precedent set in this case would allow federal courts to evaluate administrative enforcement actions, thereby limiting state agency discretion. Given the history of the Clean Water Act through

1987, this cannot have been Congressional intent. Additionally, expanding the role of courts as mediators in disputes between citizens, agencies, and polluters would place an additional burden on federal dockets. Finally, judicial involvement might ultimately discourage out-of-court settlements between agencies and polluters, since a polluter's incentive to settle would be greatly diminished if subsequent citizen suits were allowed. Thus, for additional reasons of public policy, the court concludes that the facts of this case do not support a conclusion that the DEP is not diligently prosecuting its action against defendant.

Because Connecticut's environmental protection statutes are comparable to § 1319(g) of the Clean Water Act, and because the DEP has been diligently prosecuting an action against defendant since 1985, plaintiff's citizen suit is barred. Defendant's motion for summary judgment with respect to the Clean Water Act claim is granted. Plaintiff's cross-motion for summary judgment on the Clean Water Act claim is denied.

## Part Two: RESOURCE CONSERVATION AND RECOVERY ACT

The threshold questions in determining if this court has jurisdiction over the plaintiff's claims under the Resource Conservation and Recovery Act (RCRA) are 1) whether the lead shot and target fragments are solid waste and, 2) if so, whether these materials are hazardous solid waste. Under RCRA, 42 U.S.C. § 6903(5), hazardous materials are subject to federal regulation only if they first fall within the definition of solid waste. For the reasons discussed below, this court concludes that the lead shot and target debris are solid wastes under RCRA. The court finds that the lead shot solid waste is hazardous and grants the plaintiff's motion for summary judgment with respect to that claim. But the court finds that there is a genuine dispute of fact as to whether the target debris solid waste is hazardous, rendering summary judgment inappropriate.

## I. JURISDICTION

Before addressing whether the lead shot and target debris are solid waste, the court will briefly address two jurisdictional issues raised by the defendants regarding whether they received adequate notice of the citizen's suit and whether the EPA has determined that shooting for sport does not constitute the disposal of solid waste subject to RCRA.

### A. Defendants Received Notice of the Suit

■ 42 U.S.C. § 6972(b) requires that a plaintiff give notice to the EPA, the State in which the alleged violation occurs, and the alleged violator at least sixty days before filing suit. That requirement was discussed by the Third Circuit in *Proffitt v. Commissioners, Township of Bristol,* 754 F.2d 504, 506 (3rd Cir.1985):

> "The purpose of the sixty-day notice requirement is to obviate the need for resort to the courts by prompting either administrative enforcement of the laws or voluntary compliance by alleged violators. [citations omitted] Nevertheless, these citizen suit provisions evince a legislative intent that 'citizen[s] are not to be treated as nuisances or troublemakers but rather as welcome participants in the vindication of environmental interests.' *Friends of the Earth v. Carey,* 535 F.2d 165, 172 (2d Cir.1976). Mindful of this legislative intent, this and other courts have consistently held that the sixty-day notice provisions should be applied flexibly to avoid hindrance of citizen suits through excessive formalism. [citations omitted] Thus in *Susquehanna [Valley Alliance v. Three Mile Island,* 619 F.2d 231, 243 (3rd Cir.1980)]*, this court held that the notice requirement for a citizen suit under [the Water Pollution Prevention and Control Act] *is met by a showing that the defendants and administrative agencies had actual notice of the alleged violations more than sixty days before the suit was filed.*" (emphasis added).

It is undisputed that the defendants had notice-in-fact. However, the Supreme

Court in *Hallstrom v. Tillamook County,* 493 U.S. 20, 110 S.Ct. 304, 308 n. 2, 107 L.Ed.2d 237 (1989) has indicated that notice-in-fact is not sufficient. We must turn, then, to the issue of whether the defendants received notice from the plaintiff.

On or about April 22, 1986, Remington received a document identified as a "Notice of Intent to Sue" sent by the Connecticut Coastal Sportsmen's Association. Wickersham Affidavit, filed Nov. 30, 1987, ¶ 5. The defendants contend that since the Connecticut Coastal Sportsmen's Association sent that notice letter, the Connecticut Coastal Fishermen's Association did not give the required notice of intent to sue to the defendants. The plaintiff maintains that in April, 1986, Connecticut Coastal Sportsmen's Association changed its name to Connecticut Coastal Fishermen's Association, that the organization remained the same, and that even the board members and officers remained the same until the next election.[20] Connecticut Coastal Fishermen's Association was incorporated in September, 1986. Connecticut Coastal Sportsmen's Association was apparently never incorporated. Although the defendants are correct in stating that the certificate of incorporation of CCFA does not reflect a name change from CCSA, this court is not persuaded that that raises an issue of fact as to whether there was other than a mere name change in the association prior to its incorporation.

The plaintiff has submitted affidavits supporting its statement that CCSA changed its name to CCFA, but otherwise remained the same. The defendants have not submitted any evidence to the contrary.

The court holds that there is no genuine dispute as to the material fact that the defendants received the requisite notice of intent to sue from the plaintiff.

B. *The EPA has not determined that trap and skeet shooting does not produce solid or hazardous waste subject to RCRA*

▮ The defendants rely on a letter issued by Sylvia K. Lowrance, Director of the Office of Solid Waste of the EPA, to insist that the EPA has determined that shooting ranges are not covered by RCRA. Defendants' Ex. 1, filed July 14, 1989. The letter, a response to a query from the Indiana Department of Environmental Management, is best characterized as an interpretative letter ruling. In fact, Lowrance concludes her letter by inviting questions or comments on the interpretation. This court must give deference to an agency's interpretation of its own regulations. *E.g., Ruangswang v. Immigration and Naturalization Service,* 591 F.2d 39, 43 (9th Cir.1978). Yet interpretative rules are intended to clarify or explain existing laws or regulations, and are not binding on a court. *Energy Consumers and Producers Ass'n. v. Department of Energy,* 632 F.2d 129, 139, 140 (Em Ct App 1980); *cert. den.,* 449 U.S. 832, 101 S.Ct. 102, 66 L.Ed.2d 38 (1980). Were such interpretations to have the "controlling weight" that the defendants urge, such practice would skirt the very reason for the public notice and public hearing provisions of the Administrative Procedure Act, 5 U.S.C. § 553. An analysis of RCRA and relevant judicial interpretations persuades this court that the Lowrance interpretation is not correct.

**20.** "In April of 1986 we decided to change the name of the Connecticut Coastal Sportsmen Association to the Connecticut Coastal Fishermen's Association. The board members and officers remained the same but in September we incorporated. I replaced Robert Nixon as President in April of 1987. Our goals have never changed either generally or with respect to this lawsuit. Our purpose remains the biological integrity of Long Island Sound". Affidavit of Terrance E. Backer, March 1, 1988, ¶ 14, Exhibit 1 filed March 11, 1988. "I am the past president of the Connecticut Coastal Sportsman's Association. I continue to be a member of the Associa-

tion. In the early spring of 1986 we changed the name of this organization to the 'Connecticut Coastal Fishermen's Association.' In September of 1986 we incorporated under that name. The purposes of the Association did not change. All the officers and board members remained the same until some new board members and officers were elected to replace retiring board members and officers on April 20, 1987. Two of the original CCSA board members remain as directors of CCFA even today." Affidavit of Robert Nixon, February 29, 1988, ¶ 2, Exhibit 2 filed March 11, 1988.

## II. THE LEAD SHOT AND TARGET FRAGMENTS ARE SOLID WASTE

### A. *Statutory and Regulatory Definitions*

■ RCRA defines solid waste as "any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material ... resulting from industrial, commercial, mining, and agricultural operations, and from community activities...." 42 U.S.C. § 6903(27).[21] Regulations promulgated pursuant to RCRA define solid waste as *any discarded material,* and further define discarded material as any material which is either: 1) abandoned; 2) recycled; or 3) considered inherently waste-like. 40 C.F.R. § 261.2(a). Both parties agree that the activities at Lordship Point should be assessed as to whether they fit the "abandoned" definition of discarded material. The regulations define abandoned as 1) disposed of; 2) burned or incinerated; or 3) accumulated, stored or treated (but not recycled), before or in lieu of being abandoned by being disposed of, burned or incinerated. 40 C.F.R. § 261.2(b). Here, "disposed of" is the most reasonable category. Thus, whether or not lead shot and target debris are solid waste turns on the interpretation of the meanings of "discarded" and "disposed of."

The defendants argue that lead shot and target debris are not "discarded" in any sense because the shooting of trap and skeet involves "the normal use of a manufactured product and not the generation or management of solid waste...." Defendants' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment, July 14, 1989, p. 6. Defendants also contend that RCRA does not regulate items being used for their "original intended purpose." [22] Defendants' Memorandum in Support of Defendants' Motion for Summary Judgment, November 30, 1987, p. 8. However, no "normal use" or "original intended purpose" exemption for solid waste appears in either the statute or the regulations promulgated thereunder. As a matter of law, then, that lead shot and target debris result from the "normal use of a manufactured product" does not exempt them from the "discarded" definition. As a matter of policy, if all products used for their "original intended purpose" were exempted from regulation, RCRA would be without teeth, since virtually all waste could fit within this loophole.

The defendants further argue that the RCRA definition of solid waste cannot possibly cover lead shot and target debris, for if it did, it would also cover "the loss of bullets or shot fired by hunters, the loss of lead sinkers during fishing, the loss of golf balls when golfing...." Memorandum in Support of Defendants' Motion for Summary Judgment, November 30, 1987, p. 9. This, of course, would cause an administrative nightmare and could not, they contend, have been the intention of the statute. Under RCRA definitions, however, these activities can be considered the disposal of solid waste, yet not subject to RCRA regulation as *hazardous* waste. Hazardous waste is defined as a "solid waste ... *which because of its quantity,* concentration, or physical, chemical, or infectious characteristics may ..." cause risks to health or the environment. 42 U.S.C. § 6903(5) (emphasis added). Thus, it is not necessary to decide that lead shot and target debris do not fall within the RCRA definition of solid waste based on the defendants' parade of horribles; golf balls may be solid waste, but might never reach the requisite quanti-

---

21. Plaintiff asserts that the Gun Club is both a "commercial operation" and a "community activity" because members were charged a fee for the purchase of targets and because the facility was used by a number of community groups. Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment, March 11, 1988, pp. 58–9. Defendant makes no counter-argument, focusing solely on the "other discarded material" prong of the definition.

22. There is some discussion of "intended use" in *American Mining Congress v. EPA,* 824 F.2d 1177 (D.C.Cir.1987). In that case, however, the Court decided that materials are exempt from RCRA regulation if they are intended for reuse in an ongoing production process; there is no discussion of use for "an original intended purpose."

ty to become subject to RCRA regulation as a hazardous waste.[23]

### B. *Legislative Intent*

■ Defendants contend that regulating shooting at targets was not the intent of Congress by making reference to the "Congressional findings" and "Objectives" sections of RCRA (42 U.S.C. §§ 6901, 6902). Defendants' Memorandum in Support of Defendants' Motion for Summary Judgment, November 30, 1987, p. 12. The language of these sections, however, is easily broad, or vague, enough to encompass an intent to regulate target shooting. Congress concluded that "inadequate and environmentally unsound practices for the disposal or use of solid waste have created greater amounts of air and water pollution and other problems for the environment and for health." 42 U.S.C. § 6901(b)(3). The objectives include: "to promote the protection of health and the environment and to conserve valuable material and energy resources by— ... (4) regulating the treatment, storage, transportation, and disposal of hazardous wastes which have adverse effects on health and the environment." 42 U.S.C. § 6902(4).

These sections of RCRA, with their broad scope, contain no language that would support the defendants' claim, by inference only, that the regulation of shooting activities is precluded by the statute. While not specifically encompassed by the objectives, the shooting activities in question certainly could fall within the general objectives to protect health and the environment. Of course, this argument is circular since the central question is whether lead shot and target debris are "hazardous wastes," as statutorily defined, which have an adverse effect on health and the environment. In any case, legislative intent, as evidenced by RCRA's objectives, cannot be said to preclude the plaintiff's claims. It is necessary to look for the legislative intent behind the definition of solid waste.

In interpreting the RCRA definition of solid waste, it seems clear that Congress intended to define it with some degree of specificity. The statute includes 40 definitions of terms; RCRA, in this respect, is not comparable to the Clean Water Act which defines "navigable waters" as the "waters of the United States." *United States v. Riverside Bayview Homes*, 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985). Thus, the question of what Congress intended by including "other discarded material" after "any garbage, refuse, sludge ..." in the statute is one worthy of serious consideration, particularly since the definition in the regulations promulgated under RCRA begins by defining all solid waste as "any discarded material." 40 C.F.R. 261.2.

Judge Starr views "other discarded material" as a limiting device in *American Mining Congress v. EPA*, 824 F.2d 1177 (D.C.Cir.1987), holding that (1) Congress did not intend RCRA to encompass the regulation of secondary materials reused within one industry's ongoing production process and (2) "discarded" should be read in the ordinary, plain-English meaning. Judge Starr flirts with the doctrine of *ejusdem generis* in interpreting "other discarded material." Applying *ejusdem generis*, general words following the enumeration of particular classes would be construed as applying only to things of the same general class as those enumerated. In this instance, "other discarded material" would be construed as referring only to "garbage, refuse, and sludge." *Id.* at 1189. While Judge Starr ultimately rejects *ejusdem generis* as "woodenness in the sensitive exercise of statutory construction," *id.* at 1189, he does decide that Congress did not intend to "open up the federal regulatory reach of [sic] an entirely new category of materials, *i.e.*, materials neither disposed of nor abandoned, but passing in a continuous stream or flow from one production pro-

---

**23.** It is not necessary to reach exactly what quantity is required for a solid waste to be a hazardous waste. In the instant case, 4 million pounds of lead shot and 11 million pounds of target debris clearly meet the "quantity" standard, as will be discussed below. Defendants' Memorandum in Support of Defendants' Motion for Summary Judgment, November 30, 1987, p. 12.

cess to another." *Id.* at 1190. The interpretation of "discarded" urged and rejected in *American Mining Congress,* however, is well beyond that needed for RCRA jurisdiction in the instant case because, as will be discussed below, lead shot and target debris fall within the "ordinary meaning" of discarded as set forth in *American Mining Congress.*

In any case, there is authority to suggest that the legislative intent in including "discarded" was, in fact, to broaden RCRA jurisdiction. In his *Treatise on Environmental Law,* Grad finds that Congress' inclusion of "discarded" was not a limiting device: "The report of the House Committee on Interstate and Foreign Commerce on RCRA, for example, makes it clear that the term 'discarded material' meant to *expand,* not limit, the common meaning of the term 'solid wate' [sic]. Grad, *Treatise on Environmental Law,* Volume 1A, § 4.03, p. 4–193. While it is unclear how much "discarded" was meant to include, it is safe to say that it at least includes items commonly thought of as "discarded" and does not restrict, but expands, the common meaning of "solid waste." This expansive approach is illustrated by the EPA's promulgation of the RCRA regulations at issue in *American Mining Congress.* Although the *American Mining Congress* court ultimately rejected the EPA's approach, it is telling that the EPA interpreted Congressional intent (in promulgating RCRA regulations), to include materials that are part of an ongoing production process as discarded.

Further, in the legislative history, Congress referred to a category of "post-consumer wastes," or wastes which have served their intended purpose. *Treatise on Environmental Law,* p. 4–195. These could include paint wastes, used drums, waste oil, etc.[24] Grad notes: "While acknowledging that some of these post-consumer wastes might be recycled, Congress also recognized that they were sometimes

discarded, and therefore were 'wastes.'" *Id.*[25] Congress envisioned that post-consumer wastes such as used drums, not unlike used targets or lead shot—even though used for their intended purpose—, could be considered "discarded" under the solid waste definition in RCRA.

Having determined that the legislative intent supports the conclusion that such post-consumer wastes as lead shot and target debris can be solid wastes under RCRA, we must now address whether there needs to be a physical discarding of these wastes once they become post-consumer wastes, i.e., are they discarded, and hence solid waste, as soon as they are "post-consumer," or is an intervening, physical act of discarding required, such as the gathering of lead shot and target debris in order to dispose of it.

In his dissenting opinion in *American Mining Congress,* Judge Mikva proposes that Congress intended a functional definition of discarded. He looks to the statutory definition of "disposal," which, in the regulations, is the ultimate definition of "discarded." Disposal is defined quite broadly: "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste ... may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3). The definition of disposal includes more than its everyday meaning, which leads Judge Mikva to conclude that waste should be considered discarded under RCRA " ... if it is put into contact with land or water in such a way as to pose the risks to health and environment that animated Congress to pass RCRA." *American Mining Congress,* 824 F.2d at 1196 (Mikva, J., dissenting). While the majority does not accept the idea of a functional definition, they do agree that the plain-English meaning of

---

**24.** The discussion of post-consumer wastes in the legislative history as within the meaning of discarded further refutes the defendants' argument that because something is used for its

intended purpose it is not solid waste. Congressional intent is plainly to the contrary.

**25.** *See* S.Rep. No. 284, 98th Congress, 1st Session, 9–10 (1983).

"discarded" is "disposed of," with its broad reading in the regulations.

The legislative history indicating that "discarded" was meant to expand the definition of solid waste, the broad definition of "disposal," and the possibility of a functional interpretation of the term "discarded" all buttress the plaintiff's claim that skeet shooting activities create solid waste. Conversely, there is nothing in the legislative history to suggest an intent to exempt such activities from regulation. At the very least, as the D.C. Circuit has held in *American Mining Congress*, "discarded" means what Webster's Dictionary says it does, that is, materials that have been "disposed of, abandoned, or thrown away." *Id.* at 1193. As will be discussed below, skeet shooting activities comport with this ordinary definition.

Additionally, when Congress passed the Solid Waste Disposal Act Amendments of 1983, it did so out of a strong desire to expand the existing regulatory system: "The scope of the problem and the inadequacies of the law and the current regulatory problem appear to be worse than originally estimated." S.Rep. No. 284, 98th Congress, 1st Session, 2 (1983). While these amendments did not address the definition of solid waste, they included such items as a phasing out of the exemption for small-quantity generators of hazardous waste, which backed up the Congressional intention to expand the regulatory reach of RCRA. While not dispositive, such amendments lend weight to a broader reading of the RCRA language.

## C. *Case Law*

■ No case is directly dispositive in assessing whether lead shot and target debris are solid wastes under RCRA. But the court is persuaded by the rationale, and fact patterns, of the cases discussed below that lead shot and target debris are solid wastes under RCRA.

*United States Brewers Ass'n v. United States EPA*, 600 F.2d 974 (D.C.Cir.1979), held that the EPA could require that all beverage containers sold at federal facilities have "deposit return" stamped on them. Plaintiff reads *Brewers Ass'n* as extending the EPA's regulatory reach under RCRA to permit the EPA to regulate solid wastes even prior to being "discarded." Plaintiff's Memorandum in Rebuttal to Defendant's Memorandum, September 15, 1989, p. 61. Plaintiff argues that *Brewers Ass'n* gave the EPA power to regulate beverage containers in the manufacturing process, and therefore had the authority under RCRA to regulate "pre-discarded" solid wastes. Indeed, the Court noted: "The Brewers' first contention, that beverage containers are not 'solid waste' until discarded, and hence are not properly a subject of regulation under the Act [RCRA], flies squarely in the face of the explicit definition in the statute." *Id.* at 982–3. *Brewers Ass'n* did not permit the EPA to ignore the "discarded" test, but simply permitted the EPA to regulate the waste when it is to be discarded. Of particular relevance to this case, *Brewers Ass'n* allowed the EPA to regulate the endpoint of beverage containers used in their intended way. The court recognized that, since it is impossible to regulate the discarding of beverage containers once in the hands of individuals, it must allow the EPA to regulate, at least for bottles intended to be sold at federal facilities, the manufacturer's production process, and this even though the manufacturer "discards" no solid waste.

An analogy can be made between the activities before the court in *Brewers Ass'n* and those of trap and skeet shooting. In both cases, the "manufacturer" is not the actor who does any discarding, but the actor who provides the raw materials or opportunity for the creation of solid waste. *Brewers Ass'n* implies, logically, that if solid waste is being created, i.e. bottles or lead shot or target debris at the bottom of the Sound, there must be an act of discarding. Further, if it is impossible to regulate the actor who does the discarding, or even determine at what point discarding occurs, the process should still be regulated at whatever pressure point is most appropriate. Thus, since it is impossible to have a deposit return stamp on lead shot, it is a reasonable reading of RCRA, following the

D.C. Circuit's analysis in *Brewers Ass'n,* to require the Gun Club to retrieve the shot and debris created from its activities, or, in the future, to alter its activities so as not to create the solid waste. Of course, it should be reiterated that the holding in *Brewers Ass'n* applied only to federal facilities and that the EPA had promulgated this regulation, with all the accompanying deference that implies.

This court is not persuaded by defendants' reliance on *Barcelo v. Brown,* 478 F.Supp. 646 (D.P.R.1979), *rev'd. in part, on other grounds,* 643 F.2d 835 (1st Cir. 1981), *rev'd sub nom. Weinberger v. Romero–Barcelo,* 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982), where the Court held that the dropping of Navy bombs was not the creation of solid waste, calling this activity only the "incidental depositing of debris." *Id.* 478 F.Supp. at 669. The basis for the Court's holding was that military operations are specifically not covered by RCRA. Thus, any dicta about whether the dropping of bombs in general would be the creation of solid waste, which, defendants argue, preclude any holding in this case that lead shot and target debris are discarded solid waste, are inapposite here.

Even if this court were not persuaded by the analogous rationale of *Brewers Ass'n,* the Supreme Court has opened a window for a functional judicial interpretation of environmental statutes. The Supreme Court affirmed a broad agency reading of the language of a federal environmental statute—the Clean Water Act (CWA)—in *United States v. Riverside Bayview Homes,* 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985). The CWA prohibits the discharge of dredged or fill material into "navigable waters" without an Army Corps of Engineers permit. The Corps, while initially construing this term to include only navigable waters in fact, later interpreted it as including wetlands within its regulatory authority. The Court deferred to the Corps' switch in interpretation as not unreasonable, noting that the distinction between land and water was not an easy one. *Id.* at 131, 106 S.Ct. at 461.

While the Court was responding to an agency interpretation of statutory language, it did accept, at a minimum, a significant stretch of the language. The Court clearly could not have thought that wetlands were in any sense "navigable." More likely, it recognized that exempting wetlands from CWA regulation would create an intolerable loophole which, despite the vagueness of the statutory language, could not have been the Congressional intention. The approach taken is somewhat functional, as Judge Mikva urged the Court to do in *American Mining Congress:* the discharge of dredged material into wetlands creates an environmental hazard; therefore, wetlands are navigable waters under CWA. A similar reading is possible in the case of the Gun Club: skeet shooting resulting in the deposit of lead shot and target debris in the Sound creates an environmental hazard; therefore, such activity is "discarding" for the purposes of RCRA. Of course, in this instance there is no EPA interpretation which says that skeet shooting creates solid waste. Still, the Supreme Court in *Riverside Bayview* has opened a window for a functional interpretation of environmental statutes. It is no more a stretch of statutory language to say that shooting a gun is discarding lead shot than it is to say that wetlands can be navigated.

The defendants also rely on *American Mining Congress, supra,* to argue that gun club activities do not create solid waste and cannot be regulated. In that case, the Court held that the EPA could not regulate materials destined for beneficial reuse in an industry's ongoing production process. But *American Mining Congress* addresses an interpretation of the term "discarded" not required to grant RCRA jurisdiction of the Plaintiff's claims in the instant case. The Court there held that the materials to be reused were not "discarded" under RCRA, and that "discarded" should be construed in its ordinary, plain-English meaning. The Court noted that "[t]hese materials have not yet become part of the waste disposal problem." 824 F.2d at 1186. Thus, an additional requirement for "discarded" added by the Court is that the materials be part of the waste disposal problem. In this case, this court has not

been informed that the spent shot and target debris are destined for any reuse within the ongoing process of trap and skeet shooting. It seems inherent to the activity, then, that the lead shot and target debris become part of the waste disposal problem.[26] In two recent cases, the D.C. Circuit addressed the ambiguity of the term discarded. In *American Petroleum Institute v. EPA*, 906 F.2d 729 (D.C.Cir.1990), the EPA had ruled that slag resulting from the deposit of K061 at a metals reclamation facility was exempted from certain RCRA regulations because K061 ceases to be discarded when it reaches the treatment facility. The Court held, in part, that this was not a reasonable interpretation of RCRA and remanded for further consideration. The Court noted that *American Mining Congress* "is by no means dispositive of EPA's authority to regulate K061 slag," *Id.* 906 F.2d at 741, since K061 remains discarded throughout the waste treatment process. While the facts of the case are not apposite, it is significant that the D.C. Circuit directed the EPA to construe the term "discarded" more broadly than it had chosen to do. In so doing, the D.C. Circuit approached a functional definition: K061 continues to be hazardous even after it reaches the treatment facility; therefore, it remains discarded and subject to regulation.

In *American Mining Congress v. EPA*, 907 F.2d 1179 (D.C.Cir.1990) (*American Mining Congress II*), the Court held in part that the EPA had not exceeded its statutory authority in relisting six wastes stored in surface impoundments as "discarded," even though three of these wastes *"may* at some time in the future be reclaimed." *Id.* at 1186. The Court noted: "The agency determined that material placed in wastewater treatment surface impoundments where it is 'capable of posing a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported or disposed of, or otherwise managed,' 40 C.F.R. § 261.11(a)(3), by leaching into the

ground, is 'discarded material,' and hence a 'solid waste.'" *Id.* at 1187. While *American Mining Congress I* held that materials that *will* be reclaimed are not discarded, *American Mining Congress II* held that materials that only *may* be reclaimed can be considered discarded under RCRA.

Thus, reconciling the two cases, the plain-English meaning of discarded includes materials that may be reused. The D.C. Circuit, which has considered the majority of RCRA cases, seems willing to deem items discarded if at all reasonable, particularly if the materials can functionally be considered part of the waste disposal problem. While both of these cases arose from agency regulations, the D.C. Circuit did not uniformly defer to those regulations; there is, thus, room for judicial interpretation, even in the absence of an EPA regulation on the question of gun clubs.

Finally, this Court must address whether a physical act of discarding is required in order to classify lead shot and target debris as solid waste. This Court holds in the alternative that (1) such physical discarding has in fact occurred, consistent with the above, and (2) such a physical discarding is unnecessary in this case for reasons of public policy.

This Court believes that shooting at targets is an act of discarding lead shot, target debris, and spent cartridges. This case differs from most situations of post-consumer waste since much of the waste is lost to the Sound in the consumer activity itself. Thus, the act of shooting the gun becomes the act of discarding, since the waste is not easily accessible to be disposed of thereafter. Here, as in *Brewers Association*, RCRA regulates the actor responsible for putting the waste-creating process in motion, i.e., the bottler or the Gun Club, since this actor is the last pressure point which can be regulated. Once the bottles or lead pellets and targets are in the consumer's hands, it is too late for regulation. The defendants were aware that they were creating waste, as evidenced by their collection of the trash that was easily accessible—spent gun cartridges—and should be

---

**26.** Indeed, the defendants presumably collected and disposed of part of the total trash, the spent cartridges.

held responsible for the ultimate discarding of all solid waste.

A holding in this case that only wastes physically gathered and then "discarded" can be regulated under RCRA would undermine its objectives. The defendants conceded in oral argument that, if they had picked up the shot and debris and dumped it in the Sound, they would be subject to RCRA regulation. Transcript of Oral Argument, December 19, 1989, p. 11. It was not the intent of RCRA to exempt from regulation producers who simply do not throw away their trash. It should make no difference whether the defendants physically dumped the debris in the Sound or if they supplied their land and materials to Gun Club users, knowing and consenting that these materials would end up as debris at the bottom of the Sound. Again, such a loophole would be so large as to take the teeth out of RCRA. This Court believes that even if gathering waste before discarding is necessary in general, making an exception for the unique case of this Gun Club for reasons of public policy will not open up the flood gates to whole new areas of RCRA regulation. It is difficult, in fact, to conceive of comparable situations.

The initial threshold question, whether lead shot and target fragments constitute solid waste, must be answered in the affirmative. Lead shot and target debris fit easily within the plain-English meaning of "discarded." There is never an attempt to reuse these materials, nor is there an attempt to recapture these materials at any time; they are totally abandoned. The materials are, as conceded by the defendants, part of the waste disposal problem. This Court holds therefore, in keeping with the case law and legislative history above, that lead shot and target debris are discarded and subject to RCRA regulation as solid waste.

## II. THE LEAD SHOT IS HAZARDOUS SOLID WASTE; A GENUINE ISSUE OF MATERIAL FACT EXISTS AS TO WHETHER THE TARGET FRAGMENTS ARE HAZARDOUS SOLID WASTE

■ If the lead shot and target fragments are hazardous solid waste, the Rem-

ington Gun Club becomes a hazardous waste facility under the regulations, which define a disposal facility as one "at which hazardous waste is intentionally placed into or on any land or water, and at which waste will remain after closure." 40 C.F.R. § 260.10. The defendants concede that trap and skeet shooting is a sport which may result in loss of materials to the environment. Defendants' Statement dated Nov. 30, 1987, ¶ 15. But the defendants do not concede that those lost materials are either solid wastes or hazardous solid wastes.

Defendants contend that there is a genuine issue of fact to be tried as to whether the lead shot used at the Gun Club is "EP toxic." Defendants only admit that *some sediment* samples taken from areas around the Gun Club exceed the "EP" limit for lead. Defendants' Response dated July 14, 1989, ¶ 6 (emphasis in original). Defendants admit that tests on waterfowl and shellfish that were located near the Gun Club have shown elevated levels of lead in the tissues and blood, but dispute that such organisms have been injured from shot lying around the Gun Club. Defendants' Response, dated July 14, 1989, ¶ 8. Although the defendants have directed the court to the Battelle report for purported support for their claim that there is a genuine issue of fact, the defendants have apparently overlooked the conclusion of the Battelle experts. Battelle tested the tissue of blue mussel and the blood of black duck, but "[s]amples of other organisms were not collected as originally planned, because the accumulation of lead in the tissues of mussels and ducks was sufficient to indicate a lead contamination problem requiring remediation at Lordship Point." Exhibit 9 to Plaintiff's Memorandum filed March 11, 1988, p. F–1. The defendants having failed to demonstrate that there is a genuine issue of fact as to whether the accumulations of lead shot are hazardous, the court grants the plaintiff's motion for summary judgment on its RCRA claim with respect to the lead shot.

■ Defendants also dispute whether the artificial targets (1) contain materials

listed as hazardous waste under RCRA because of toxicity, (2) are dangerous, and (3) have or exhibit carcinogenic and mutagenic characteristics. Regarding pyrogenic PAH's, which the defendants concede are present in the artificial targets, the defendants dispute whether the PAH's are dangerous and whether they exhibit or demonstrate carcinogenic and mutagenic characteristics. Defendants' Response, dated July 14, 1989, ¶ 9. Stahl Affidavit, Defendants' Exhibit 7, filed July 14, 1989. The defendants dispute which PAH's comprise the artificial targets, with the exception of pyrogenic PAH's. Defendants' Response, dated July 14, 1989, ¶ 10. The defendants dispute whether the target materials pose a danger to shellfish and humans. Defendants' Responses, dated July 14, 1989, ¶ 13. The factual dispute regarding the toxicity of the target material must be addressed at an evidentiary hearing; summary judgment is therefore inappropriate.

CONCLUSION

The defendants' motion for summary judgment on the Clean Water Act claims is granted; the plaintiff's motion on the same claims is denied. The plaintiff's motion for summary judgment with respect to lead shot under the Resource Conservation and Recovery Act is granted; the defendants' cross motion is denied. Both the plaintiff's and the defendants' motions for summary judgment with respect to target debris under the Resource Conservation and Recovery Act are denied, factual disputes rendering summary judgment inappropriate.

SO ORDERED.