**HUDSON RIVER FISHERMEN'S ASSOCIATION, Plaintiff,**

v.

**COUNTY OF WESTCHESTER, Andrew O'Rourke, County Executive, Defendants.**

No. 87 Civ. 1575 (GLG).

United States District Court, S.D. New York.

May 26, 1988.

Lower Hudson Legal Services, Inc., White Plains, N.Y. (Robert F. Kennedy, of counsel), for plaintiff.

Rosenman & Colin, New York City by Martin S. Baker, Marc E. Kasowitz, Hector Torres, Margaret M. Harding, for defendants.

## OPINION

GOETTEL, District Judge:

Last year this country was treated to the spectacle of a New York garbage barge shuttling up and down the east coast in an effort to locate a receptive host for its odious cargo. The ensuing fiasco dramatized what surely is to become an increasingly difficult and testy political question in the 1990's and beyond—what is this country going to do about its solid and hazardous waste?

This case presents a variation on that theme. For years the common practice in this country was to dump its waste—consumer, industrial, and otherwise—in vast landfills. The modus operandi was "out of sight, out of mind." Unfortunately, given the crude state of waste management and scientific know-how at the time, most of these dumps are environmental time bombs waiting to leach toxic materials into our rivers and water systems. Thus, not only must we come to grips with our present and future waste problems, but past disposal practices will increasingly deserve our immediate attention as these time bombs detonate and leach pollutants into our environment. This case is brought by a group acting as "private attorneys general" under the Federal Clean Water Act seeking damages and injunctive relief relating to one such dump along the Hudson River.

## I. FACTS

Croton Point is a large area of almost 600 acres on the east shore of the Hudson River. It juts for a couple of miles into the widest section of the Hudson River, forming the southeast corner of Haverstraw Bay and the northern border of Croton Bay. It was one of the largest tidal marshes on the Hudson River and was an important ecological area for various types of flora and fauna.

In 1927, a quiet time between two world wars when ecological considerations were of less significance and the Croton area less populated, Westchester County decided to put a major landfill on a part of the Croton Marsh.[1] For almost sixty years it was an active dump. Initially, only seventy acres of the marsh were used. The dump gradually expanded, however, ultimately engulfing most of the wetlands. During the same period, a county park was developed in conjunction with the landfill, with a beach maintained on the river.

Until 1973, the dump was a receptacle for not only domestic refuse but also industrial wastes. Of the thousands of tons of garbage dumped daily at this site, about 10% were industrial wastes containing chemical pollutants, volatile organic components, metals, sewage, and even radioactive materials. The dangers of having such a major environmental threat so near such an important waterway and recreational and ecological area were not recognized until the 1950's. For decades thereafter, the Westchester County Board of Supervisors and its Department of Parks, Recreation and Conservation attempted, with little success, to deal with the problem.

In 1972, the Federal Government, through the Environmental Protection Agency ("EPA"), conducted an investigation into the problem of "leachate" emanating from various parts of the landfill.[2] It appeared from EPA tests that the waters surrounding the landfill had high concentrations of specific organic and metallic substances. Recommendations were made concerning the operation of the landfill, including the implementation of a plan for ground-water monitoring and topographical changes to protect the marshlands. The County indicated that it agreed with the report and would proceed to implement the recommendations. Notwithstanding that

fact, the Government shortly thereafter instituted a civil action against the County, *United States v. Michaelian [the then-County Executive]*, 72 Civ. 1964 (CBM), under the Rivers and Harbors Act of 1899, 33 U.S.C. § 401 *et seq.*, the New York Harbor Act of 1888, 33 U.S.C. § 441 *et seq.*, and under common law claims of public nuisance. The thrust of that complaint was that the County's landfill was unlawfully discharging leachate into the Hudson River without a permit.

On February 18, 1975, a final consent judgment was entered in that case. The judgment acknowledged that the County had been or was in the process of complying with the EPA's requirements with respect to ending pollution in the Hudson River area from the landfill. The consent decree required the County to operate and maintain the landfill in conformance with regulations and standards promulgated by New York's Department of Environmental Conservation ("DEC").[3] The consent decree also set forth plans for ending use of the landfill when it had reached an appropriate size, for covering those portions of the landfill that were already at their maximum grade, and for capping and sealing the landfill to eliminate infiltration of rain water or other sources which could recharge existing ground water. Under the consent decree, the County is required to monitor annually both the ground-water table under the landfill and the leachate flow from the landfill until five years after the date of the final capping. It also must submit annual reports to the EPA, DEC, and the United States Attorney's office describing the steps taken pursuant to the consent decree. These reports were submitted. In the interim, the County looked for alternatives for garbage disposal, raising complicated local political concerns

1. A "landfill" is a polite name for a garbage dump.

2. As used in the context of a landfill, leachate refers to that substance which is created when, over a period of time, compression of the solid waste, and other refuse contained within the landfill, forces liquid from the refuse. Leachate can also be produced when storm water seeps into the landfill and mixes with the refuse. The

resultant liquid, or leachate, takes on the properties of certain constituents of the refuse. Leachate typically is very concentrated, high in metal and organic constituents.

3. The DEC is a New York agency which shares the responsibility for regulation and enforcement of environmental matters with the EPA.

which were not quickly resolved. The United States District Court for the Southern District of New York retained jurisdiction over the *Michaelian* action.

In November 1985, the Hudson River Fishermen's Association ("HudFish"), the plaintiff in this action, complained that the County was violating certain provisions of the consent decree. The United States Attorney's office for the Southern District of New York was requested to and did reopen its investigation. On June 30, 1986, the County closed the landfill and retained consultants and experts to prepare plans for the final capping and sealing of the landfill. The plans were submitted to the EPA and DEC in July of 1986 for approval.

Although the landfill is no longer receiving any form of garbage, sewage, or industrial waste, it continues to be an ecological problem of substantial magnitude. The materials dumped over the decades contained a certain amount of liquids, some of which are pollutants in and of themselves, and the remainder of which mix with toxic wastes forming leachate. In addition, as indicated *supra* note 2, storm water is absorbed by the landfill and, through a mixing process, also can become leachate. This leachate does not remain stable within the landfill. Some of it percolates to the surface, some of it leaches downward and outward. Due to the area's geological configuration, the tendency for all moving liquids, both on the surface and subsurface, is to gravitate toward the Hudson River. As a partial answer to this problem, the County has created a pool. The plaintiff (and at times, the County) has referred to this pool as a "leachate lagoon." [4] The County maintains that it is primarily a storm-water collection pool and has no more than 5% leachate in it. Given the size of this pool, however, even a 5% fraction would represent an enormous amount of pollutant.

Next to the landfill, and adjacent to but below the pool, there is a drainage ditch—also on County property. The purpose of this ditch is to collect rain water from park and parking lot areas and direct it to a discharge pipe which goes underground and ultimately discharges into the Haverstraw Bay, a couple of hundred feet from the Croton Beach swimming area. The plaintiff alleges that, since at least July 10, 1981, this pipe has been discharging effluent containing metals, inorganic substances, and fecal coliform into the bay, thereby polluting the river and the nearby beach. It is the contention of the plaintiff that this pollution is escaping from the "leachate lagoon" either through or under the protective berm and into the adjacent drainage ditch. The County, based on its own chemical samples, vigorously denies this. County officials, however, acknowledge that this is a possible result due to subterranean percolation, and there is sufficient evidence from other sources who have observed the drainage ditch and the outflow to raise a substantial factual issue as to whether this has occurred. Beyond any question, the adjacent waters have been polluted on recent occasions. Although the County argues that this is caused by natural storm-water runoffs, it appears to the court that, considering the size of the landfill, there are a number of sources from which the landfill could pollute the nearby areas until and unless an effective capping of the entire surface of the landfill takes place.

In light of the various complaints from interested sources, including HudFish, the United States Government instituted proceedings against the County, charging it with contempt of court in failing to observe the terms of the earlier consent decree. Before those proceedings were brought to court, however, HudFish commenced a "citizen's suit" under section 505 of the Clean Water Act ("CWA"), 33 U.S.C. § 1365. The complaint is directed particularly to the claim that the drainage ditch and outflow

---

**4.** As part of a leachate recirculation system, waters in the pool are pumped back to the top of the landfill and allowed to drain back down. It is questionable whether this system accomplishes much in the long run. In any event, there have been failures in the recirculation system, allowing the waters to escape to unintended places. The Westchester County Department of Health, in a 1986 report, noted problems with respect to the leachate pond. The County Engineer also has noted deficiencies in the system.

pipe are illegally discharging pollutants into the river in violation of section 301 of the CWA, 33 U.S.C. § 1311.[5] The complaint alleges that the County does not have a permit to use the ditch and outflow pipe for the discharge of pollutants. Plaintiff now seeks fines for past violations, injunctive relief, and attorney's fees. Thereafter, the government brought on its contempt proceedings against the County. While those proceedings were *sub judice*, the County moved to dismiss this action on two separate grounds. The first is that HudFish may not maintain a citizen's suit since such suits are limited to the enforcement of administratively established effluent standards. The second is that since there existed a governmental prosecution seeking the same relief, HudFish's suit was not only superfluous but was barred by the terms of the CWA. Neither of these issues is easily resolved.

## II. DISCUSSION

### A. *The need for an effluent standard as to the drainage ditch and outflow pipe*

Citizen suits are expressly permitted under the CWA when they seek to enforce *"an effluent standard or limitation ... [or] an order issued by the Administrator [of the EPA] or a State with respect to such a standard or limitation...."* Section 505 of the CWA, 33 U.S.C. § 1365(a)(1) (emphasis added). The purpose of this limiting provision is to prevent private citizens from invoking the power of the Federal courts to establish, rather than enforce, effluent standards. There are no effluent standards or limitations for storm-water drains in general or the particular ditch and pipe in question. The plaintiff acknowledges this, but argues that the discharge pipe is no longer simply a storm-water drain; rather, it is argued, the drain now qualifies as a "point source" (described *infra*) under the CWA since it is not com-

posed entirely of storm water but also includes leachate. *Cf. AL Tech Specialty Steel Corp. v. EPA,* 846 F.2d 158, 159 (2d Cir.1988) (holding that catch basin which received leachate from landfill consisting of precipitation mixed with dissolved emission control dust was subject to regulation under the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*). This is a factual contention that this court cannot rule upon without an evidentiary hearing. If we were to conclude that the ditch and pipe constituted a point source for the discharge of pollutants, the operation of that pipe would require a permit issued by the EPA or by New York State consistent with the National Pollutant Discharge Elimination System established by section 402 of the CWA, 33 U.S.C. § 1342. Plaintiff also notes that, lacking a specific effluent guideline for a particular type of pollution, an administrative permit can issue on a case-by-case basis establishing "such conditions as the Administrator [of EPA] determines are necessary to carry out the provisions of [the CWA]." *Id.* at § 1342(a)(1).

A "point source" is any discernible or discreet conveyance, expressly including pipes and ditches, from which pollutants are or may be discharged. Section 502 of the CWA, 33 U.S.C. § 1362(14). In 1987, Congress made clear that "the term 'point source' includes a landfill leachate collection system." Water Quality Act of 1987, Pub.L. No. 100-4, § 507, 101 Stat. 7, 78 (1987). For that matter, leaks from a leachate collection system have been held to constitute a possible point source. *O'Leary v. Moyer's Landfill, Inc.,* 523 F.Supp. 642, 647 (E.D.Pa.1981).[6] In plaintiff's view, the drainage ditch in question is, de facto or otherwise, a secondary leachate collection system. Consequently, the complete prohibition against discharging without a permit, it argues, constitutes a

---

**5.** That section makes it illegal to discharge pollutants in violation of the CWA which requires, *inter alia,* that a permit be obtained to authorize the discharge of pollutants.

**6.** Point sources under the CWA also have been construed to include such exotic circumstances

as the use of a bombing range off the coast of Puerto Rico, where there was no permit nor applicable regulations. *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 309, 102 S.Ct. 1798, 1801, 72 L.Ed.2d 91 (1982).

sufficient "effluent standard or limitation" to underpin a citizen's suit.

The County responds by arguing that, until 1984, there were no regulations for storm-water outlets and that it was not until 1985 that regulations in connection with such were proposed. The submission of a permit application initially was required by April 25, 1985 for all storm-water conveyances in urban areas. Early in that year, however, the DEC decided not to solicit active permit applications for storm-water discharges and not to process those that were submitted. The EPA then extended the deadline for storm-water discharge permit applications ultimately until the end of 1987.[7] Despite these delays, the County decided to file permit applications for certain storm-water outlets on property owned by it, including the one in question. In November 1986, however, the DEC told the County that it would be inappropriate to process the applications at that time.

Beyond the implementing delays described above, it appears the DEC also was concerned about the ongoing review and possible proceedings by the United States Attorney's office and/or the relevant regulatory agencies with respect to the Croton Point landfill. The DEC was hopeful that the ultimate closure plan might eliminate the need for some of the outfalls. For a period of a year thereafter numerous meetings were held between the County and the DEC with respect to this problem. The DEC stated that it would take no formal action until it decided whether the landfill should be categorized as a "Class II" site (*i.e.*, an inactive hazardous waste site) in its inactive site classification scheme. Thereafter, in light of its continuing problems with the landfill, the County decided that the problem could best be solved by treating the landfill as a Class II site. Nevertheless, the DEC has refused to act upon the permit application. To this the plaintiff replies that the extended application deadlines and problems in connection therewith do not insulate or exempt storm-water point sources from liability under section 301 of the CWA, 33 U.S.C. § 1311(a). To that, the defendants respond that the level of pollution in the outflow would be well within any standards that might be applied. Obviously, this latter assertion presents factual issues not ripe for determination at this time.

The National Pollutant Discharge Elimination System implements a regulatory scheme founded upon administratively established limitations and standards for point sources. A private right of action is established when a discharge is in contravention of the clearly defined standards. *State of New York v. United States*, 620 F.Supp. 374, 383 (E.D.N.Y.1985). As Judge Friendly noted in discussing the legislative history of the CWA's citizen-suit provisions:

> The discussion of the citizen suits provision in the Senate Report explains that "[a]uthority granted to citizens to bring enforcement actions under this section is limited to effluent standards or limitations *established administratively* under the Act." S.Rep. No. 414, 92d Cong., 2d Sess. 80 (1972), *reprinted in* 1972 U.S.Code Cong. & Ad.News 3668, 3747 (emphasis added).

> \* \* \* \* \* \*

> According to the Senate Report, the section of the Act authorizing citizen participation was *"carefully restricted to actions where violations of standards and regulations ... are alleged,"* S.Rep. No. 414, *supra* at 78, 1972 U.S.Code Cong. & Ad.News at 3745 [emphasis added], *in order to limit private suits to supplemental enforcement of administratively established criteria, and to prevent individuals from invoking the power of the courts to set as well as enforce standards* [emphasis added]:

> "[The citizen suits provision] would not substitute a 'common law' or court-developed definition of water quality[.] An alleged violation of an effluent control limitation or standard, would not require

---

7. It appears that these extensions were motivated in part by the EPA's indecision as to how to deal with the problem of storm-water outlets.

We do not know what has transpired on this issue since the beginning of the year.

reanalysis of technological in [sic] other considerations at the enforcement stage. These matters will have been settled in the administrative procedure leading to the establishment of such effluent control provision. Therefore, an objective evidentiary standard will have to be met by any citizen who brings an action under this section.... *Id."*

*United States v. Hooker Chemicals & Plastics Corp.*, 749 F.2d 968, 979–80 (2d Cir.1984).

We have no quarrel with these general propositions, and we agree with defendants that these requirements place important limitations on a private citizen's ability to bring suit under the CWA. Consistent with *Hooker Chemicals*, plaintiff in this case could not bring suit to establish effluent standards for the Croton Point pipe (if, indeed, that pipe may fairly be construed as a point source).

The instant case, however, differs from the typical situation discussed by Judge Friendly in *Hooker Chemicals*, where a permit has been obtained and the issue is whether the polluter is complying with the terms of the permit. Here, no permit has been secured. Thus, defendants argue, since no administratively established effluent levels have been set, plaintiffs are barred from bringing a citizen suit. We think such a conclusion suffers from an unwarranted and "hypertechnical" reading of section 505 of the CWA, 33 U.S.C. § 1365(a)(1). As noted *supra*, that section authorizes citizen suits to enforce "an effluent standard or limitation." Paragraph (f) of that section defines the term "effluent standard or limitation" to include any violation under section 301 of the CWA, 33 U.S.C. § 1311(a). Consistent with the statutory scheme, it is a violation of section 301 for a polluter to discharge a pollutant without first obtaining a permit. *EPA v. California ex rel. State Water Resources Control Bd.*, 426 U.S. 200, 205 & n. 14, 96 S.Ct. 2022, 2025 & n. 14, 48 L.Ed.2d 578 (1976). Thus, on the face of the statute, obtaining a permit is itself an important effluent *limitation,* and private attorneys general may enforce that limitation via citizen suits.

This same conclusion was reached by Judge Duffy in *Love v. New York State Dep't of Envtl. Conservation,* 529 F.Supp. 832 (S.D.N.Y.1981). In *Love,* the corporate defendant was allegedly discharging pollutants not subject to the terms of a discharge permit that previously had been obtained. Thus, like the instant case, the plaintiff was suing for unpermitted discharges. Judge Duffy held that this constituted a prima facie claim for a citizen suit as it sought enforcement of an important limitation on effluent discharge. *Id.* at 843. *See also id.* at 839 (noting that "[a]n effluent standard or *limitation* includes at a minimum the discharge of any pollutant without a permit") (emphasis added). In our view, *Love* is not inconsistent with the broad propositions set forth in *Hooker Chemicals,* and we do not believe that it was overruled by that later decision. In support of this conclusion, we note that *Love,* which was decided nearly three years earlier than *Hooker Chemicals,* was neither cited nor discussed by Judge Friendly in his discussion on the breadth of the CWA's citizen-suit provisions—suggesting to us that Judge Friendly did not believe *Love* was inconsistent with his analysis.

■ Obviously, in the case at bar, plaintiff cannot sue to enforce a specific, administratively established effluent standard since a permit has not issued. It can, however, sue to enforce an important *limitation* on effluent discharges, to wit, the requirement that a permit first be obtained before pollutants are discharged. We note, as discussed *infra,* that in these situations there are valid reasons for preferring enforcement actions by appropriate governmental agencies to those initiated by private citizens. Contingent upon establishment at an evidentiary hearing that the defendants are intentionally using the storm drain at Croton Point as a point source for pollutant discharge, however, plaintiff has stated a valid cause of action for a citizen suit under the CWA.

■ An additional issue concerning the subject matter jurisdiction of this court has been raised since the original filing of this

motion. On December 1 of last year, the Supreme Court ruled that citizen suits cannot be maintained for wholly past violations of the CWA. *Gwaltney of Smithfield v. Chesapeake Bay Found., Inc.,* — U.S. ——, 108 S.Ct. 376, 381–84, 98 L.Ed.2d 306 (1987). Thus, to the extent that plaintiff's complaint rests on such, this court lacks jurisdiction over the claim(s).

The instant complaint, however, alleges continuing violations by the County (*i.e.,* continuing, unpermitted discharges of pollutants from the pipe). Good faith allegations of continuing or intermittent discharges satisfy the *Gwaltney* pleading standard. *Id.,* 108 S.Ct. at 385.

 The County, however, apparently believing the pipe was no longer worth the legal troubles it was creating, had the pipe capped subsequent to the argument on this motion.[8] The County thus contends that there is no continuing violation and that plaintiff cannot maintain a citizen suit consistent with *Gwaltney.* It is the state of affairs at the time the complaint is brought, however, which control as to the jurisdictional question. *Id.* at 387 (Scalia, J., concurring). This does not mean that the action or parts of it may not at some future date become moot. *Id.* at 386. The plaintiff, however, recently submitted additional photographs and affidavits to establish that the pipe's plug or cap leaks and may manually be removed. There is also the suggestion that during heavy rains, the cap is intentionally removed to prevent backup of surface water which may then flood across an adjacent roadway. It also is alleged that the effluent flowing from the pipe is noxious and polluted. Under these circumstances, the complaint more than satisfies the *de minimis* prima face standard for alleging in good faith an ongoing violation.

8. We surmise that the storm water collected in the drainage ditch is being diverted into the collection pool.

9. A crucial distinction would seem to be that plaintiff in this case seeks penalties for past violations, while the Government has elected to forego past penalties in its action. There is a

For all of these reasons, we believe that a citizen suit in this case may be maintained.

### B. The existence of the Government's suit

The CWA prohibits private suits where the government "has commenced and is diligently prosecuting" a suit seeking the same relief. Section 505 of the CWA, 33 U.S.C. § 1365(b)(1)(B). HudFish argues that the Government has not diligently prosecuted its suit against the defendants. After this motion was argued, the Government's motion for contempt based upon the consent decree in *United States v. Michaelian* came on before Judge Motley. At that point, counsel for the parties agreed to a settlement which includes, *inter alia,* addressing the alleged unlawful discharge of pollutants from the pipe in question. The settlement is rather complicated and provides for an expert to be retained by the United States to determine whether, and to what extent, pollutants are, in fact, being discharged from the pipe. If such is found to be the case, the County must take appropriate measures to prevent such discharges including, if necessary, the removal of the pipe. Political considerations that have bedeviled this problem for years caused a substantial period of time to pass before the County legislature approved the settlement. Consequently, the next step has not yet taken place (the expert study), but should shortly. Under these circumstances, we find that the Government is actively litigating its action.

The plaintiff contends, however, that it is proceeding under the CWA while the *Michaelian* action was commenced under the Rivers and Harbors Act (presumably because the CWA had not become effective when that suit commenced). Plaintiff also notes that the remedies available to it under the CWA differ from those available to the Federal Government in its action.[9]

substantial question in our mind as to whether HudFish is entitled to past penalties in light of *Gwaltney.* *But see Public Interest Research Group of N.J., Inc. v. Carter–Wallace, Inc.,* 684 F.Supp. 115 (D.N.J.1988) (holding *Gwaltney* limited to jurisdictional question and does not prohibit recovery of past penalties in citizen suit if

Further, Hudfish argues that, because it cannot intervene in the Government's action, dismissal of this suit will leave the group without a remedy. We are particularly unimpressed with this latter argument. The thrust of the CWA is to provide *society* with a remedy against polluters in the interest of protecting the environment. Section 101 of the CWA, 33 U.S.C. § 1251(a). If the Government's action achieves that end, the fact that HudFish or any other private attorney general is barred from duplicating that effort should hardly seem surprising or harsh. The Government, of course, as representative of society as a whole, usually is in the best position to vindicate societal rights and interests. In those instances where, for whatever reasons, the Government fails or declines to take action, the CWA allows citizens acting as private attorneys general to fill the void. That does not mean, however, that HudFish is *ipso facto* entitled to its own, "personalized" remedy in this or any other CWA case. *See especially Gwaltney*, 108 S.Ct. at 382 (noting that if government action is initiated, it presumably renders citizen suit unnecessary).[10]

■ Notwithstanding the justifications proffered by plaintiff for continuing this suit, we think the controlling issue to be different. The Government's proceedings are based solely on the original consent judgment issued in 1975, a copy of which was offered as an exhibit on the instant motion. That judgment provides, *inter*

*alia*, that, contingent on an effective capping or sealing of the landfill, the consent judgment "shall not be deemed to apply to the discharge of leachate occurring due to the natural movement of water through, over or under the Landfill." Thus, the consent judgment, for whatever reasons, does not address or include ground-water pollution under the landfill or, for that matter, storm runoff unrelated to the landfill. Both are potential sources of any effluent allegedly emanating from the Croton Point pipe. Plaintiff has asked this court to enjoin further, unpermitted discharges from that pipe, and it is conceivable that the source of that pollution is technically beyond the scope of the original consent judgment and subsequent contempt settlement in *Michaelian*.[11]

■ The sum of it is that while we believe the very serious environmental problems existing because of the landfill are better addressed through governmental action, particularly since the pipe at issue is in all likelihood only a part of the greater problem (the landfill), we cannot at this time say with any confidence that the conclusion of the Government's litigation will address or encompass the specific claims of the plaintiff in this suit. We emphasize that when the Government is actively litigating a corollary enforcement effort, plaintiffs bringing citizen suits under the CWA are not entitled to maintain their actions simply to secure "personalized" relief. Such actions are not barred, however,

jurisdictional requirements met). We may have cause to revisit this issue at some future date in this case. Holding as we do on other grounds that this suit is not now rendered moot by the Government's action, however, we need not address the past penalties issue at this time. We leave it for a future time when it may be more fully briefed and orally argued by the parties.

10. Indeed, we note that the Government's enforcement efforts have been due in large part to complaints registered by HudFish. Moreover, the memorandum of law submitted by HudFish's counsel in this action borrows heavily from the Government's papers in *Michaelian*, although it is not so acknowledged. It is fair to say that HudFish and the Government have been working in close conjunction on these matters, strongly suggesting the overlapping nature of these cases.

11. This cannot fairly be characterized a quibble. The distinction is grounded in the defendants' own position, vigorously propounded, that the landfill itself (as opposed to the ground water below it or storm-water runoff from other sources such as the adjacent roadway) is *not* the source of pollutants and leachate finding their way into the drainage ditch, if any such pollutants and leachate can be found there at all. Indeed, to the extent defendants acknowledge that, on occasion, pollution in the Croton Point area has occurred, they attribute this to storm-water runoff. Such runoff is a major reason for beach closures in the New York metropolitan area since it produces high coliform levels. Why this is so is not apparent from the papers before the court.

when it appears that the Government's effort does not address the factual grievances asserted by private attorneys general. In those circumstances, it cannot be said that the two actions are duplicative or are addressed to the same concerns. Consequently, we find that, at this time, the existence of the *Michaelian* action does not bar plaintiff from pursuing this suit.

## CONCLUSION

For all of the above reasons, the defendants' motion for summary judgment is denied.

SO ORDERED.