**ORANGE ENVIRONMENT, INC.,**
**Arthur E. Soons and Sandra**
**Soons, Plaintiffs,**

**Hudson Riverkeeper Fund, Inc.,**
**Plaintiff–Intervenors,**

v.

**COUNTY OF ORANGE,**
**et al., Defendants.**

**91 Civ. 8688 (GLG).**

United States District Court,
S.D. New York.

April 18, 1996.

**530**

Scott A. Thornton, New Hampton, New York, Elizabeth Barbanes, Katonah, New York, for Plaintiff Orange Environment, Inc.

Jeffrey P. Soons, New Hampton, New York, for Plaintiffs Arthur and Sandra Soons.

Pace Environmental Litigation Clinic, White Plains, New York by Robert F. Kennedy, Jr., Karl S. Coplan, Timothy B. Mooney (Legal Intern), for Intervenor–Plaintiff Hudson Riverkeeper Fund, Inc.

LeBoeuf, Lamb, Greene & MacRae, L.L.P., Albany, New York by Robert J. Alessi, Vincent P. Esposito, Jr., Theresa Atkins, for Defendant County of Orange.

OPINION

GOETTEL, District Judge.

The plaintiffs move for partial summary judgment and a preliminary injunction, including a declaratory judgment.[1] The defendants, Orange County and its officials, cross move for partial summary judgment and to dismiss the action.

Logic would indicate that when both parties move for summary judgment, there are few, if any, facts in dispute and the Court is called upon simply to determine issues of law. However, when as here the parties file hundreds of pages of affidavits and thousands of pages of exhibits, it becomes apparent that there are many disputed factual issues. This is clearly confirmed by the parties local Rule 3(g) statements in which each side disputes the facts on which the other bases their motion, while at the same time contending that the facts supporting their motion are not in dispute.

### THE FACTS

The following is a brief resume of pertinent facts leading up to the current motion.[2]

In 1971, Orange County (the "County") acquired some 300 acres of land from the State of New York for use as a landfill. The Orange County Landfill (the "landfill") is located in the Town of Goshen, Orange County, New York in the Wallkill River Valley. The landfill is surrounded on three sides by various parts of the Wallkill River. Further south, the Wallkill flows into the Hudson River.

The Cheechunk Canal carries the major portion of the Wallkill's flow past the landfill

---

1. Plaintiffs also request: "an immediate consolidated hearing on this motion with plaintiffs' requested permanent injunction," the appointment of a Special Master to oversee removal and restoration activities, an order imposing civil penalties on the defendants (which could total tens of millions of dollars), and attorneys' fees and costs.

2. Defendants devote more than forty pages of their initial memorandum of law to the history of this action. The plaintiffs' exposition is equally long. This more limited recitation is drawn in large part from this Court's earlier decisions in this case, *Orange Environment, Inc. v. County of Orange,* 811 F.Supp. 926 (S.D.N.Y.1993) and *Orange Environment, Inc. v. County of Orange,* 860 F.Supp. 1003 (S.D.N.Y.1994).

on its southeast side. The original riverbed of the Wallkill, or the Old Channel, flows along the landfill's south and northwest sides. The Southern Wallkill Valley aquifer (the "aquifer") flows under it.

On July 6, 1973, the County submitted plans for the landfill to the New York State Department of Environmental Conservation ("DEC"). The plans called for three separate landfill areas on the property to occupy a total of 245 acres. The DEC issued a permit to begin construction on May 23, 1974, and on September 30, 1974 operation began in the landfill area nearest to the Cheechunk Canal.

The County operated the landfill from 1974 to January 1992. During that time period approximately seven million cubic yards of predominately municipal waste was deposited on a 75–acre portion of the property.

When the County built the original landfill, it did not construct a liner to prevent contamination from entering groundwater below the site or surface water adjacent to the site. However, a good portion of the landfill site lies over a naturally occurring layer of clay and silt. Because fine grained deposits do not transmit fluids easily, clays underneath a landfill can retard the downward migration of leachate.[3] Unfortunately, the clay/silt layer beneath the landfill is not of uniform depth or composition. "Windows" occur in areas where the clay and silt is absent and sand appears at the ground's surface which can provide a pathway for leachate to enter the aquifer. Underneath the sand layer is a layer of bedrock. While the bedrock is generally composed of solid rock, it often contains fractures through which water can move. Domestic wells in the area surrounding the landfill tap the bedrock for water. Thus, sand deposits within the silt/clay layer can serve as conduits for contaminant migration away from the landfill. The contaminants may travel either down into ground water contained in bedrock fractures or sideways to surface waters contained in riverbeds. Other possible leachate pathways also exist.

Leachate was first detected in 1975 when the DEC recorded two observations of leachate at the landfill. Leachate was also observed entering a water course once in 1976 and twice in 1977. Thereafter, numerous instances of leachate discharges were noted.

In 1981, the DEC issued the County an operating permit valid until August 1983 under new state landfill regulations. In addition to compliance with state regulations, the permit included conditions involving leachate.

On August 22, 1983, ten days after the 1981 permit expired, the County requested and received from the DEC an extension permitting operation until June 30, 1984. The extension was granted without public discussion or participation. In August of 1985, the DEC issued a new policy prohibiting the construction or expansion of landfills over principal aquifers and defined the landfill area as one such area.

On December 31, 1986, the County and the DEC executed a consent order relating to the County's unpermitted use of the landfill since the permit had expired at the end of June 1984. The order required that the County submit a lifespan determination report, sub-surface investigation report, and a proposal for interim leachate removal and disposal. The order provided that the interim leachate management proposal would be in effect until such time as a permanent leachate management system was implemented. The order did not, however, provide a specified date on which the permanent system must be in operation.

After obtaining extensions of its compliance deadlines, the County submitted to the DEC an interim leachate management plan in February of 1987. At the DEC's request, this plan was revised and resubmitted in April of that year. The DEC approved it, subject to further modifications made on

---

**3.** "Leachate" has been defined as "[a]n aqueous liquid that contains soluble or suspended matter acquired as the water percolates through solid waste, soil, underlying mineral strata, or other materials." *New Castle County v. Hartford Accident and Indemnity Co.,* 933 F.2d 1162, 1167 n. 5 (3rd Cir.1991), *quoting,* 2 International Dictionary of Medicine and Biology 1533 (1986). The water producing the leachate can be the result of the moisture originally contained in garbage, precipitation, groundwater, or any combination of the three.

May 16, 1987. The installation of the interim leachate management system began in June of 1987, and its eastern side was complete by the summer of 1988.

In November of 1987, the DEC filed an enforcement complaint against the County for violation of operating conditions at the landfill. It was contemplated that the old landfill would be closed, and (to the extent possible) sealed by the end of 1991, and replaced by an expansion landfill.

The problems cited in the 1987 complaint had not been resolved by early 1989, and on February 23, 1989, the DEC sent a letter to the County. The letter chastised the County for failing to fully implement the interim leachate management plan despite many reminders from the DEC. The DEC warned that the County's "persistent failure to control the leachate" on its existing landfill jeopardized its pending application for an expansion permit.

In 1987, the County had applied for a permit to construct a 154–acre expansion to the existing landfill. Despite the County's contention that it was entitled to landfill on the unused portion of the 300 acre parcel under the original 1974 permit, the DEC disagreed. The DEC also maintained that the expansion was not "grandfathered" out of the state environmental impact review requirement.

A mandatory public hearing was held on issues relating to the expansion application beginning on November 18, 1987. Plaintiff Orange Environment, Inc. ("OEI") participated in the permitting process as a party in interest, and had previously submitted a letter setting forth its concerns. Although the expansion hearing was originally consolidated with the pending enforcement action, the enforcement action was adjourned at the DEC's request. The expansion application was denied by the Commissioner of the DEC due to possible danger to the Southern Wallkill Valley aquifer, and because inadequate consideration was given to alternative sites.

The County then submitted a revised application for a smaller, 75–acre expansion which OEI had supported. The DEC approved this revised application in December of 1988 for a 75–acre landfill expansion that would operate in four phases. Construction on Phase I, designed to receive over 700,000 cubic yards of fill, was completed in October 1990. Eighty percent of Phase II was completed when work ceased for the winter in December of 1991. The County financed the cost of constructing the landfill expansion by the issuing General Obligation Bonds totalling approximately $42.5 million in principal and interest.

In July of 1989, the DEC had issued permits for the construction and operation of the expansion. The placement of fill materials was performed as provided by the DEC construction permit. (It was not until two years later that the need for Federal permits became a public issue.)

Meanwhile, the County and the DEC entered into a second Consent Order on July 7, 1989 concerning violations at the existing landfill. This Order alleged five violations of the 1986 Consent Order, including failure to implement the revised leachate management plan and failure to meet various deadlines. The Order also alleged several violations of New York landfill regulations. The County admitted violation of the 1986 Order and drainage of leachate without a permit.

In consideration for the DEC's withdrawal of its complaint, the County agreed to spend $300,000 on the acquisition of real property for an Environmental Credit Project. The DEC also assessed a $375,000 civil penalty against the County, $300,000 of which was suspended for so long as the County complied with the Environmental Credit Project.

From March 1990 to September 1991, a DEC monitor was on-site three days a week. He completed weekly monitoring reports, and in 1990 identified 19 instances of leachate discharging into surface waters. No penalties, however, were assessed against the County. In 1991, the DEC monitor reported 6 instances of leachate discharging into surface waters. The monitor also found 64 violations for uncontrolled leachate on or near the site and for failure to minimize leachate and prevent its discharge into surface waters.

On October 18, 1991, OEI served the County, the United States Environmental Protection Agency ("EPA") and the DEC with a notice of intent to bring suit concerning the discharge of the leachate into the surrounding waters, open dumping and other violations of various environmental statutes. OEI also asserted state common law claims.

On November 1, 1991, two weeks after OEI issued a notice of intent to bring suit, the DEC's Regional Director wrote to the County stating that "neither the existing landfill closure, nor the completion of the expansion area has progressed satisfactorily." Because "sufficient evidence existed to commence enforcement action," the Director informed the County that it would soon present the County with a draft Consent Order to resolve the violations. Finally, the letter stated that the existing landfill would not be permitted to operate after December 31, 1991.

On December 12, 1991, shortly before this action was commenced, the EPA and the Army Corps of Engineers ("Corps"), conducted a field investigation at the site. This investigation was clearly in response to OEI's notice of intent to sue letter.

In December 1991, before the landfill expansion opened or the old landfill closed, and after the County and the EPA were given plaintiffs' pre-suit notice of intent to sue pursuant to 33 U.S.C. § 1365(b) of the Clean Water Act ("CWA"), OEI and Arthur and Sandra Soons brought suit against the County and various County officials. They claimed, *inter alia*, that certain unpermitted discharges of pollutants had occurred violating § 301 of the CWA, 33 U.S.C. § 1311. In particular, plaintiffs claimed that almost fifty acres of federal wetlands[4] had been filled

without a permit.[5] Plaintiffs sought restoration of the lost wetlands and penalties for defendants' unpermitted discharges.

In January 1992, the County announced a suspension of its construction activities. The County hired a consultant to investigate the landfill site and render an opinion. The consultant reported that restoration of lost wetlands at the site would require huge amounts of soil from another wetland and its success would be speculative at best.

On January 15, 1992, the County and the DEC entered into a third Consent Order. The Order identified unpermitted discharges of leachate in nine separate locations and vertical expansion of the landfill in violation of the 1986 Order. It required the County to undertake an Environmental Credit Project at the cost of at least $75,000. The Order assessed $100,000 in civil penalties, but $75,000 was suspended for so long as the County complied with the credit program. The Order allowed the landfill to accept solid waste through January 1992 and required the County to submit a closure plan.[6]

In February of 1992, the EPA notified the County that it was investigating possible unpermitted filling of wetlands subject to federal jurisdiction at the landfill expansion site. Shortly thereafter, the County and the EPA began negotiating a Compliance Order. Discussions were held in New York regarding the forthcoming order. The EPA issued a Compliance Order in July 1992. Among other things, the Order required the County to restore lost wetlands off-site at an amount twice what the EPA concluded had been lost (98 acres to replace 49) and allowed the County to recommence a phased operational use of the landfill expansion subject to satisfactory completion of the off-site wetlands

---

4. A "wetland" was known in less environmentally enlightened times as a "swamp" or even a "bog". *See* Webster's Third New International Dictionary. A "landfill" was known to earlier generations as a "garbage dump."

5. The County now concedes that the placement of fill into the landfill expansion, thereby replacing wetlands, violated the CWA since at least one acre of federal wetlands was filled at the landfill.

6. Despite the fact that the old landfill ceased to accept waste for disposal in January of 1992, the DEC report for that year documents 31 violations for failure to minimize leachate through drainage control. On October 23, 1992, the DEC sent a letter to the County assessing $25,000 of the suspended $75,000 penalty due to violations of the 1992 Order. Leachate had been observed flowing into the Wallkill River on four occasions in September and October of 1992.

restoration.[7]

In August of 1992, the DEC issued a permit to operate three of the seven subcells of Phase I, the permit to expire in July of 1994. The DEC, however, attached a number of conditions that the County must satisfy before operations could commence. The County decided that fulfilling these conditions would entail a significant expense which was not justified before resolution of this action.

Both sides then moved for summary judgment. We granted plaintiffs' motion and denied defendants' motion, holding that the Compliance Order issued by the EPA to the County, settling the violations of the CWA at the landfill, did not remove the County's duty to obtain a Section 404 permit from the Corps before commencing operations at the landfill site. *Orange Environment, Inc. v. County of Orange,* 811 F.Supp. 926 (S.D.N.Y. 1993). This decision effectively enjoined the defendants from further expansion of the site until they received the permit, and therefore mooted the plaintiffs' motion for a preliminary injunction.

In January of 1993 the County entered into a fourth Consent Order with the DEC requiring the County to implement a full inactive hazardous waste disposal site remediation program and receive up to 75 percent reimbursement from the state. Soon thereafter the County Executive announced her intention to abandon the expansion project and commence settlement negotiations. However, in February of 1993 the County legislature moved to intervene as a separate party defendant in order to appeal our decision on the summary judgment motions. We denied the legislature's intervention motion, and the legislature appealed. *See Orange Environment, Inc. v. County of Orange,* 817 F.Supp. 1051 (S.D.N.Y.), *affirmed, Orange Environment, Inc. v. Orange County Legislature,* 2 F.3d 1235 (2d Cir.1993). Although unsuccessful, the appeal delayed settlement negotiations until the following year when County Executive McPhillips was voted out of office. Her successor, of the same party as the legislative majority, decided to continue the litigation. However, by June of 1994 he too gave up hopes for expanding the landfill in light of the legal obstacles.

In 1994, the defendants moved to dismiss or for summary judgment. We dismissed the plaintiffs' CWA claims for civil penalties but not their claim for injunctive relief. We also dismissed plaintiffs' first and second Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq., claims but not their third and fourth RCRA claims or their pendent state claims.

## THE PENDING MOTIONS

The present motions are not directed to the leachate problems of the old landfill, but concern solely the filling of wetlands as part of the expansion. The parties spend hundreds of pages disputing when each first became aware that federally protected wetlands ("federal wetlands") were involved in the Orange County landfill expansion.[8] All

---

7. Following the issuance of the EPA Compliance Order, plaintiff filed a motion for a preliminary injunction in this Court. The Hudson Riverkeeper Fund, Inc., simultaneously moved to intervene. The intervention was granted and decision on the preliminary injunction motion was reserved pending an evidentiary hearing at which time the preliminary injunction motion was to be consolidated with a decision on a permanent injunction.

8. The definition of wetlands differs between that applied by New York State and that applied by the federal government. The CWA defines wetlands as "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adopted for life in saturated soil conditions."

The determination of what constitutes a federal wetland is not a simple matter but rather is based on a three parameter approach which requires examination of an area's vegetation, soils and hydrology. The *Federal Wetland Manual* directs the procedures to be employed in determining whether there is federal jurisdiction. The manual is considered controversial because some believe that it has substantially increased the amount of acreage subject to Section 404 of the Clean Water Act. *Wetlands Loss and Agriculture: The Failed Regulation Of Farming Activities Under Section 404 Of The Clean Water Act,* Joseph G. Theis, PACE ENVIRONMENTAL LAW REVIEW, Fall 1991. Some recommend a less scientific approach: "I think we ought to define a wetland as an area where ducks swim more than they waddle." Dean Kleckner, President, American Farm Bureau Federation quoted in *Defining Wetlands For Regulatory Purposes: A Case Study*

involved were aware that "wetlands" were present at the landfill construction site, but the determination of whether they fell within federal jurisdiction was somewhat delayed. While the parties hurl charges and recriminations at each other as to when they learned of the presence of federal wetlands, this issue cannot be resolved on papers and, indeed, for present purposes need not be resolved.

■ The voluminous papers filed in these cross motions do not adequately focus on the rather narrow issue we now decide. We have previously held that the filling of federal wetlands without a section 404 permit violated the Clean Water Act. However, we also noted that citizens suit jurisdiction in the federal district courts exists only where there is a continuous or intermittent violation. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). The burden is on the plaintiff to produce evidence of a continuing violation. *Connecticut Coastal Fishermen's Assoc. v. Remington Arms Co.*, 989 F.2d 1305 (2d Cir.1993). The plaintiff argues that discharged fill on a federal wetland (unless done pursuant to a 404 permit) remains a continuing violation of the CWA for so long as it remains in place. *See e.g. Sasser v. EPA*, 990 F.2d 127, 129 (4th Cir. 1993). Defendants respond that any continuing violation was remedied by the EPA's Compliance Order for off-site remediation with which they have already complied.

■ Defendants also argue, relying on *Gwaltney, supra,* that this Court lacks subject matter jurisdiction to entertain the plaintiff's claims for relief since construction of the landfill had effectively stopped before the plaintiff's suit was commenced. Further, defendants assert that there was no likelihood of construction being resurrected thereafter. This argument is completely fallacious. While construction of the landfill did cease for the winter in late 1991, it was the continued intent of the defendants to proceed with the landfill throughout 1992 and into the beginning of 1993, when this Court ruled that

the expansion of the landfill could not go forward without the Corps' approval. During 1992 the County met with the EPA resulting in the issuance of the July 30, 1992 Compliance Order. The County sought permission to use the expansion landfill pursuant to a permit from the DEC, which it did not secure until August 1992. As of the date of the DEC operating permit, the County was entitled to use a portion of the landfill expansion and made clear its intent to do so starting October 2, 1992. The County's counsel advised the Court by letter dated September 15, 1992 of this intent. While we reject this argument, the defendants alternatively argue that even if there were jurisdiction to consider the plaintiffs' claims at the commencement of the action, the Court has since lost jurisdiction because the landfill expansion has been completely abandoned and the violations remediated.

The plaintiffs take the opposite tack. They argue that this Court has already held that the defendants could not rely on the EPA Compliance Order to avoid the burden of obtaining a section 404 permit for the landfill expansion, and that this court has already held that it must get one, after-the-fact. Consequently, they argue that because violations have already been established, we need now only determine an appropriate remedy. Because plaintiffs rely on our January 1993 decision, it is essential that we analyze what was and was not decided in that opinion.

### THE JANUARY 1993 DECISION

In our decision of January 20, 1993, we made what we termed a narrow legal determination that no future filling at the landfill expansion site could occur absent a section 404 permit:

> We reach no decision on the propriety of the EPA's remediation decision as opposed to the restoration of the filled wetlands. We do not hold that restoration is automatic nor do we say that the unpermitted fill should remain in place. We express no

opinion as to whether an "after-the-fact" permit for the filled wetlands should have been ordered by the EPA.... [O]ur holding in this case simply means that the compliance order cannot authorize *future* unpermitted discharges of fill which might otherwise run afoul of § 404.

811 F.Supp. at 936.

We also held that "[t]o the extent ordering the restoration of wetlands off-site represents the EPA's enforcement for past violations—i.e. the dumping that has already occurred—the plaintiffs citizen suit may arguably be supplanted." *Id.* at 936. However, we specifically avoided deciding the impact of the EPA's Compliance Order stating: "[t]he propriety of the compliance order's off-site remediation as a remedy for the CWA violations at the landfill raises distinct issues which we do not address at this juncture without benefit of an evidentiary hearing." *Id.* at 931. To hold that this intentional decision not to resolve an issue amounts to an adjudication would misapply the law regarding issue preclusion. *Liona Corp. v. PCH Assoc. (In re PCH Assoc.)*, 949 F.2d 585, 593 (2d Cir.1991).

At that point, more than three years ago, we believed an evidentiary hearing was necessary on this issue. However, there have been developments in recent years which negate the need for an evidentiary hearing and give the Court a basis for deciding this limited issue on the papers before us.

### STATUS OF THE LANDFILL

The County's DEC permits to construct and operate the landfill expansion have expired. New and more stringent regulatory standards have been imposed, particularly with respect to construction above aquifers. Moreover, this Court's earlier ruling with respect to the need for a 404 permit (which the County has already decided would be too expensive to obtain) bars any further expansion or operation of the landfill. The original landfill is closed and has been the subject of monitoring efforts since January of 1992. It is clear that the County has abandoned its expansion projects, and indeed, both the County Executive in office in 1992 and 1993 and the succeeding County Executive have

publicly announced that the landfill expansion has been abandoned. Even the plaintiffs' moving papers speak of it as being an abandoned project.

### THE POSITION OF THE ARMY CORPS OF ENGINEERS

■ The CWA delegates primary responsibility for the implementation and enforcement of the CWA to the EPA and the Corps. *Bersani v. Robichaud*, 850 F.2d 36, 40 (2d Cir.1988), *cert denied*, 489 U.S. 1089, 109 S.Ct. 1556, 103 L.Ed.2d 859 (1989). However, only the Secretary of the Army, acting through the Corps, is authorized to issue permits for the discharge of fill material into wetlands. CWA section 404(a), 33 U.S.C. § 1344(a). The Corps must apply EPA guidelines for the specification of disposal sites in considering any permit application. CWA section 404(b), 33 U.S.C. § 1344(b).

On December 12, 1991, the EPA and the Corps conducted a joint field investigation at the site in response to the plaintiffs' allegations of wetland violations. Apparently that investigation did not conclusively determine the presence of federal wetlands. Thereafter the matter progressed as indicated in the recitation of facts above including the earlier rulings of this Court. The issue of whether the EPA Compliance Order calling for off-site remediation mooted the need for an after the fact section 404 permit rapidly came to the fore. Both sides have been importuning the Corps to support their respective views concerning the need for a permit in light of the present situation.

Initially the Corps indicated by letter that its involvement with the landfill was concluded by the EPA's Compliance Order to which the Corps voiced no objections. A later letter solicited by the plaintiffs reflected a somewhat different position. The letter indicated that the Corps would process an after the fact permit application for illegally discharged fill material which remained in place pursuant to the terms of the EPA Compliance Order. However, the letter also stated that the Corps had not taken a position regarding the need for such an after the fact permit. The letter concluded that whether the Corps would issue such a permit would

be determined by its District Engineer in accordance with the relevant Corps and EPA regulations. In what appears to have been the final Corps pronouncement on the subject, a Dr. Mallery indicated that "there are a number of different views on this issue, including those of the Federal Court and those of the project's opponents, and some of these views are not entirely consistent with the regulations and procedures of this office." It is apparent, therefore, that the Corps understandably seeks to avoid taking a position on a difficult issue concerning the respective powers and duties of the two agencies since it is a matter in litigation and subject to court ruling.

### THE EPA REMEDIATION ORDER

The parties dispute the amount of federal wetlands which received fill as part of the landfill expansion. The defendants now contend that only 4.3 acres were involved. The plaintiffs' expert indicates that forty or more acres were involved. In negotiating the EPA Compliance Order, the defendants agreed to use the figure of 49 acres without conceding that that amount had actually been involved.[9]

The amount of federal wetlands involved is not a matter crucial to the determination of this motion. There must be more than one acre involved to make it a federal wetland. If the amount were less than ten acres, however, no permit would have been required but merely notice to the Corps (which, in any event, was not provided). Following the EPA's decision that on-site remediation was not the most efficacious approach, the County agreed to create off-site wetlands as part

of its remediation effort. The defendants state, and there is no evidence to the contrary, that they have created 98 acres of off-site federal wetlands.[10]

Although the Compliance Order was drafted by the EPA as the lead agency in the enforcement action, it was approved by the Corps as substantially addressing its principal enforcement issues. The Order appears to be an expert administrative determination of both agencies that off-site remediation was an appropriate resolution of the CWA violations in order to insure compliance with the Act.

We do not know whether the EPA and the Corps decided that on-site restoration was not possible, or merely that off-site restoration was a more satisfactory approach. Defendants now argue that on-site restoration is not possible since the soils that previously existed at the site were removed during construction, destroying the land's ability to successfully develop wetland characteristics and associated functions. Defendants argue, moreover, that attempting to do on-site restoration could increase the harm to the environment rather than correct it. They argue, and submit expert opinions, that removing the fill material and attempting to reconstruct the wetlands would provide a direct path to surface water for any leachate breakouts or similar pollution from the old landfill site.

Plaintiffs, of course, disagree. We need not, however, resolve the dispute as to whether on-site remediation is possible or desirable.[11] We do note, however, that to the

9. The difficulty in determining the amount of federal wetlands involved is not surprising. It is not a cut and dried decision (perhaps we should say "wet and dry" decision). It becomes particularly difficult to make a determination when the wetlands have already been filled in, as is the case here.

10. For a period of time there was a dispute as to whether the Corps' authorization and approval would be required for activities associated with the off-site wetlands mitigation project. Initially the Corps indicated that the availability of nationwide general permit would likely obviate the need for a section 404 permit. At that point, the plaintiffs sued the Corps. The Corps then rescinded its March 4, 1994 Compliance Order and indicated that a section 404 permit for the off-

site mitigation might be required when the application was administratively complete. The Corps, however, later approved the mitigation plan of the EPA without requiring a section 404 permit application, as the plan submitted by the County invoked no jurisdictional activity.

11. The parties raise a number of other issues which we either cannot or need not now resolve. For example, as mentioned above, they have submitted extended papers accusing each other of concealing knowledge of the fact that federal wetlands had been filled. They also argue over whether the aquifer under the landfill would be damaged by the expansion, the defendants arguing that the waters in it flow upward (and not downward as plaintiffs contend), and therefore

extent the plaintiffs disagreed with the EPA and Corps approach to remediation, they could have challenged those parties by court action, as they had done earlier (see note 10), but did not do here.

## LEGAL EFFECT OF EPA CONSENT REMEDIATION ORDER

The critical issue in this motion is whether the EPA's off-site remediation Order bars plaintiffs' claims for injunctive relief. Plaintiffs argue that it does not, asserting that the present condition of the landfill constitutes a continuing violation of the CWA because wetlands have not been restored to the site. As is discussed below, we reject this argument and hold that the defendants' compliance with the EPA off-site remediation Order moots plaintiffs' claims for injunctive relief.

■ Under the Supreme Court's holding in *Gwaltney, supra*, the mootness doctrine protects defendants from the maintenance of suits based solely on violations wholly unconnected to any present or future wrongdoing. 484 U.S. at 66. While the critical time for determining whether there is an ongoing violation, for civil penalties, is when the complaint was filed, *see Connecticut Coastal Fishermen v. Remington Arms*, 989 F.2d 1305, 1311 (2d Cir.1993), for injunctive relief alone,[12] the rule is different.

■ "If, after the complaint is filed, the defendant comes into compliance with the Act, then traditional principles of mootness will prevent maintenance of the suit for *injunctive relief* as long as there is no reasonable likelihood that the wrongful behavior will recur." *Atlantic States Legal Foundation v. Tyson Foods*, 897 F.2d 1128, 1135 (11th Cir.1990) (emphasis in original). As we have already discussed, there is no reasonable likelihood that the landfill operations will recommence at the site. That finding alone, however, does not resolve this issue. We must further determine whether the de-

fendants have "come into compliance with the Act" and whether "wrongful behavior will recur." If we find that defendants are in compliance with the CWA, and that any wrongful behavior will not recur, we must dismiss plaintiffs' claims for injunctive relief as moot.

■ Plaintiffs would have us hold that defendants have not come into compliance with the CWA because wetlands have not been restored to the landfill site. We disagree. While plaintiff is correct that wetlands have not been restored, we hold that defendants' compliance with the EPA off-site remediation Order puts them in compliance with the CWA.

Both the EPA and the Corps were involved in the investigation and enforcement concerning the unpermitted filling of the federal wetlands. This resulted in the Compliance Order of July 1992, to which the Corps took no objection. The plaintiffs currently argue that the Corps must have a say in whether an after-the-fact section 404 permit should be issued, thereby sanctioning or condemning the existing situation.

There is of course a distinction between the CWA's permitting function and its enforcement function. The granting of an after-the-fact permit is but one of several alternatives available to the enforcement agencies. The wetlands have already been filled. The issue is what to do about enforcing the Act. The EPA has concluded that the best enforcement was an off-site remediation creating at least twice the amount of federal wetlands that had been filled. An EPA Compliance Order is clearly another one of the ways to address CWA violations. If the Corps had indicated a disagreement with the approach taken by the EPA, we might have had to resolve an inter-agency dispute. That, however, did not occur.

cannot be affected. Defendants also raise a claim of laches against the plaintiffs for not making this application earlier. We find this argument unavailing in light of the prolonged period of possible settlement negotiations between the parties.

12. In our August 22, 1994 decision, we dismissed plaintiffs' citizen suit under the CWA for civil penalties. We held that the DEC's diligent prosecution of administrative action barred such claims, but that plaintiffs' claims for injunctive and declaratory relief were not barred. 860 F.Supp. at 1018.

The regulations to the CWA, which are applicable to policies and procedures for activities performed without required Corps permits, lists "several methods discussed in the remainder of this part which can be used either singly or in combination to implement the regulations." 33 C.F.R. §§ 326.1, 326.2. The EPA, with the consent of the Corps and acting as the lead agency, decided that a Compliance Order for off-site mitigation was the most effective way of dealing with enforcement. (For that matter, besides the implicit concurrence of the Corps, the EPA has independent enforcement authority under the CWA for unauthorized discharges.) The agency charged with implementation and enforcement of the section 404 program has interpreted the section not to require an after-the-fact permit or on-site remediation. The Court should give deference to that administrative interpretation. *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 131, 106 S.Ct. 455, 461, 88 L.Ed.2d 419 (1985); *Chevron USA v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984).

We also find persuasive the Second Circuit's decision in *Atlantic States Legal Foundation v. Eastman Kodak, Co.*, 933 F.2d 124 (2d Cir.1991). In that case, a citizen suit was dismissed as moot where it alleged the same violations which had been the subject of a settlement between the DEC and the defendant, resulting from an enforcement action which was commenced after the filing of the citizen's suit. Although recognizing that the suit was not barred by section 505(b)(1)(B), relying on *Gwaltney*, the Court dismissed the suit as moot. It concluded that a citizen suing pursuant to section 505 "may not challenge the terms of the settlement between [the defendant] and the [state environmental agency] unless there is a realistic prospect that the violations alleged in the [citizen's suit complaint] will continue notwithstanding the settlement." *Id.* at 127.

The fact that the remediation order here does not meet the desires of the private parties is not crucial. As this Court previously held in an earlier action involving one of these plaintiffs, the "thrust of the CWA is to provide *society* with a remedy against polluters in the interest of protecting the environment. If the government's action achieves that end, the fact that ... any other private attorney general is barred from duplicating that effort should hardly seem surprising or harsh." *Hudson River Fishermen's Ass'n v. Westchester County*, 686 F.Supp. 1044, 1052 (S.D.N.Y.1988). As we further held, parties "bringing citizen suits under the CWA are not entitled to maintain their actions simply to secure 'personalized' relief." *Id.*

The rights of private individuals suing with respect to environmental damage was recently the subject of a Supreme Court decision. *Meghrig v. KFC Western, Inc.* —— U.S. ——, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996). The issue in that case concerned whether a citizen's suit provision of the RCRA would authorize private citizens to recover environmental cleaning costs at sites that no longer posed a contamination threat. The Supreme Court unanimously held that it did not. (Some of the remaining claims in this case are brought under the RCRA.) The Court held that private parties must file suit while conditions at the site present a substantial danger to the environment and may not sue after the problem has been remediated and the danger abated. The Court held that the RCRA focuses on present and future dangers only, unlike the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"). The issue of whether the private parties could obtain restitution under the RCRA while the dangers still existed was left open, although the opinion suggests that the Court would be reluctant to read into the RCRA remedies not clearly provided by Congress. While the CWA is not the RCRA, the general approach of confining citizen suits to ongoing contamination threats is similar.

A further practical reason exists for not adopting the plaintiffs' argument that, despite the Compliance Order, the lack of on-site remediation constitutes a violation of the CWA. If the plaintiffs were correct in their view that a section 404 permit after-the-fact is the only way of remedying an illegal fill of federal wetlands, it would be impossible for

the EPA to ever negotiate a Compliance Order. Under the plaintiff's view, even if there were no existing litigation at the time of administrative proceedings, any interested party could, despite an EPA Compliance Order, at any subsequent time [13] commence a citizen's suit demanding removal and on-site remediation. While this somewhat smacks of civil double jeopardy, there would be no impediment to it if plaintiffs' view of the law is correct.

For the foregoing reason, we uphold the EPA and the Corps' determination expressed in the Compliance Order, and find that the County's compliance with that Order put them in compliance with the CWA.

We also hold that the site's continuing lack of wetlands does not constitute "wrongful behavior" precluding a finding that plaintiffs' injunctive claims are moot. Our holding follows the Second Circuits decision in *Connecticut Coastal Fishermens Assoc. v. Remington Arms Co., supra.* In that case, there had been an unpermitted discharge for some 70 years of 16 million pounds of lead shot and clay fragments (fill material) into a marsh which was a habitat for one of the state's largest duck populations. 989 F.2d at 1308. The plaintiffs' complaint alleged that the lead shot and clay debris on-site constituted a permitless discharge of fill material in violation of sections 402 and 404 of the CWA. An amended complaint alleged that there was nothing to indicate that these discharges "will not resume at some later date." *Id.* at 1312. An administrative order in the prior year had directed that there be no further discharges and the district court dismissed the CWA claims, finding that the plaintiff had failed to establish a continuing violation. The court rejected plaintiffs argument that the lead shot previously deposited in the sound was a violation because it continued to

dissolve. On appeal the Court noted that the "present violation requirement of the Act would be completely undermined if a violation included the mere decomposition of pollutants." *Id.* at 1313.

The present situation comes down to a question of whether the private citizens can overrule the judgment of the EPA and demand an additional and different type of remediation than that settled upon by the federal authorities. We do not believe they do have, or should have, such a power. Consequently, we grant defendants' motion for partial summary judgment.

### THE REMAINDER OF THE ACTION

As can be seen from the extensive statement of facts, the filling of federal wetlands is only a small part of the problems at the Orange County landfill. Most of the difficulties arise from the fact that the landfill was located in what was governmentally a desirable place: cheap land with little or no other viable use and far from a built up residential area where citizens might complain about the operation. However, by locating the landfill in a relatively remote area which has been undeveloped, there was the risk of violating the environmental laws. That was particularly true of a site that was located between a river and a channel and over an aquifer. Consequently, even though the old landfill has been closed and the new expanded landfill has been abandoned,[14] and even though we have resolved the dispute concerning remediation of the federal wetlands, there still remain a number of causes of action awaiting resolution.

The County has requested that the Court order discovery to be completed within 90 days so that the unadjudicated claims can be tried as soon as possible.[15] The plaintiffs

**13.** There is at least district court authority for the proposition that, although the fill remains without a permit, it is not such an ongoing violation that the statute of limitations never runs. *United States v. Telluride Co.,* 884 F.Supp. 404 (D.Colo. 1995).

**14.** More than 11 years have passed since the County started its expansion of the landfill and no solid waste has been deposited in it, nor is there any indication that any ever will be. If we

were to use the "duck test", *supra* at footnote 8, we would consider the Orange County landfill to be a "dead duck."

**15.** One unadjudicated claim is rendered moot by our decision here. The plaintiff had asked for declaratory relief declaring the defendants to be in violation of, *inter alia,* § 404 of the CWA. The defendants have argued that, aside from the merits of the matter, no proper application has been made for a declaratory judgment. Since we

request that, in light of this Court's extensive involvement in the case, it not be reassigned to another judge even though my duty station has been moved from the Southern District of New York to the District of Connecticut, where I now sit by designation. Unfortunately that cannot be done. When I left the Southern District I was asked to surrender my chambers to the new judge who was finally found to replace me. Although a new courthouse has now been constructed, I am advised that there are now three full time judges, as well as a senior judge, two magistrates and a bankruptcy judge, who occupy all of the chambers and courtrooms. Consequently, the case will have to be reassigned to one of the judges in White Plains. Unless the parties indicate that some other disposition is possible, I will request reassignment in 30 days.

**SO ORDERED.**

have ruled in favor of the defendants on the § 404 issue, that dispute does not need to be resolved. As noted earlier, plaintiffs have RCRA claims. Also requiring adjudication are the claims of the private plaintiffs, the Soons, concerning flooding of their property along the channel which they claim was caused by the operation and construction of the landfill. (The defendants position is that high water surface elevation was the result of beaver activity.)